******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JOSE DIEGO GONZALEZ
## (AC 41512)

Lavine, Keller and Bishop, Js.

*Syllabus*

Convicted of the crimes of home invasion, sexual assault in the first degree and of risk of injury to a child, the defendant appealed. The defendant's conviction resulted from an incident in which he entered the minor victim's apartment while her family was asleep and sexually assaulted her. The defendant claimed, inter alia, that he was deprived of his constitutional rights to a fair trial and to be heard by counsel at the close of evidence because his counsel could not effectively rebut the prosecutor's position during closing argument to the jury. The defendant asserted that his counsel was prevented from knowing how the prosecutor intended to marshal the evidence because she did not present her substantive discussion of the evidence until the rebuttal portion of her argument to the jury. *Held*:

1. The evidence was sufficient to support the defendant's conviction of home invasion, as the jury reasonably could have concluded that he unlawfully entered the victim's dwelling with the intent to commit the crime of sexual assault by the use of force: the jury reasonably could have inferred from the entirety of the evidence that the defendant had been observing the victim's dwelling, knew the layout of the apartment and the family's sleeping habits, and had been watching the victim through her bedroom window, as the defendant acknowledged evidence showing that he entered the dwelling through her brother's bedroom window, knew how to get to the victim's bedroom, asked her age, and told her that what he was going to do would not hurt before he put a pillow over her face and sexually assaulted her; moreover, the defendant was in the apartment for a short period of time, disturbed no one but the victim, committed no other crime and immediately left after sexually assaulting the victim, and it defied common sense and experience to believe that the defendant thought that the victim willingly would have been open to his sexual predation, such that he believed that he would not need to use the threat of force to sexually assault her.

2. The defendant could not prevail on his claim that he was entitled to a new trial, which was based on his assertion that prosecutorial improprieties during closing argument deprived him of his constitutional rights to a fair trial and to be heard by counsel at the close of evidence:

   a. The format of the prosecutor's closing argument was not improper and did not deny the defendant his constitutional right to be heard by counsel during closing argument; the court did not deny defense counsel the opportunity to make a final argument to the jury, the arguments of the prosecutor and defense counsel demonstrated that each was aware of the evidence and the opposing party's theory of the case, the defendant did not identify any controlling authority regarding the use of time in closing argument, and the record showed that defense counsel reminded the jury that he had one opportunity to address the jury although the prosecutor had two opportunities, pointed out the weaknesses in the state's case, argued that the DNA evidence was unreliable and that the state should not be entitled to rely on it, was able to address the evidentiary issues that formed the basis of both portions of the prosecutor's final argument and directly attacked statements that the prosecutor made during her summation.

   b. The defendant's claim that the prosecutor improperly raised new issues and mischaracterized DNA and fingerprint evidence during her rebuttal argument was unavailing: the record was inadequate to address the defendant's assertion that the prosecutor's argument about DNA evidence implicated errors in probabilistic reasoning, as the prosecutor's argument was predicated on the evidence, the defendant presented no evidence to support his claim and failed to object to the prosecutor's DNA argument or to seek to correct the claimed misstatement, and some degree of imprecision can be expected when a layperson discusses

or evaluates scientific or statistical evidence without the benefit of expert testimony; moreover, the defendant could not have been prejudiced by the prosecutor's argument about the fingerprint evidence, as there was no fingerprint evidence that connected him to the crimes at issue, and the prosecutor's comment that fingerprints on a window in the brother's bedroom could have been there for 100 years was not improper, as the point of her argument, which incorporated testimony by a police officer that the victim's house was estimated to be 100 years old, was to emphasize that no one knew when or who put the fingerprints on the window, and whether the remark was hyperbole or in response to the argument of defense counsel, the arguments of both counsel had a basis in the evidence.

c. The defendant could not prevail on his unpreserved claim that he was entitled to a new trial because his counsel was not given an opportunity to counter the prosecutor's statement in her rebuttal argument that the defendant was the only person in Connecticut who could be a contributor to a certain DNA mixture; defense counsel did not object to the prosecutor's statement, and he made clear to the jury in his final argument all of the problems in the collection, preservation and testing of the DNA evidence after the prosecutor, at the conclusion of the first portion of her summation, told the jury that DNA was the key to the case.

3. The defendant could not prevail on his claim that he was entitled to a new trial on the charge of home invasion because the prosecutor misled the jury during closing argument about the elements of that crime; although the prosecutor read the charge of home invasion as it was stated in the information, indicated that the applicable statute (§ 53a-100aa) was wordy and gave a shorthand description of that crime, she more than once told the jurors that the court would instruct them on the law and that the court's instructions were what counted, and the defendant having failed to claim that the court improperly charged the jury on the crime of home invasion, it was presumed, in the absence of evidence to the contrary, that the jury followed the court's instructions.

Argued October 17, 2018—officially released March 12, 2019

*Procedural History*

Substitute information charging the defendant with three counts of the crime of sexual assault in the first degree, and with the crimes of home invasion and risk of injury to a child, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Blue, J.*; verdict of guilty; thereafter, the court denied the defendant's motions for a judgment of acquittal and for a new trial, and rendered judgment in accordance with the verdict, from which the defendant appealed. *Affirmed.*

*Kevin W. Munn*, assigned counsel, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Stacey M. Miranda*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Jose Diego Gonzalez,[1] appeals from the judgment of conviction, rendered after a jury trial, of one count of home invasion in violation of General Statutes § 53a-100aa (a) (1), three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that there was insufficient evidence that he intended to commit sexual assault by force at the time he entered the victim's home.[2] He also claims that the prosecutor's closing argument was improper and (1) deprived him of his right to be heard by counsel during final argument, (2) deprived him of the right to a fair trial, and (3) entitled him to a new trial on the charge of home invasion. We disagree and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts on the basis of the evidence presented at trial. The victim was ten years old on October 15, 2014, when the defendant entered her first floor apartment in a three-family house in Meriden at approximately 3:40 a.m. At that time, the victim, her mother, her mother's boyfriend, and the victim's younger siblings and stepsiblings were asleep in their respective bedrooms.[3] The front door, a living room window, and the victim's bedroom window faced the front of the house above the porch that ran across the front of the house. The victim's brother had a bedroom in the rear of the apartment with a window above a hatchway that the defendant could have used to enter the apartment.

Earlier, at approximately 8 p.m., the victim had fallen asleep in her bed in the room that she shared with her stepsisters. The victim awoke shortly before 3:45 a.m. when she felt someone touch her lower back. She saw a black man with short dreadlocks leaning over her. She did not know him, asked him who he was, and what he was doing there. The defendant did not answer her but asked her how old she was. She stated that she was eight years old, hoping that he would leave her alone. The defendant touched the victim's buttocks beneath her shorts and underwear. The victim pushed herself against the wall to stop him. The defendant took hold of the victim's ankles and put one over each of his shoulders and told her that "this wouldn't hurt . . . ."

The defendant pulled the victim's shorts and underwear down to her knees and put a pillow over her face. He pulled down his own pants, and rubbed and licked the victim's vagina before penetrating it with his penis. The victim tried to get away from the defendant, but she could not free herself from his grip. When the defendant finished, he pulled up the victim's underwear and shorts and threatened to kill her if she told anyone what he

had done. He covered her with a blanket and told her to go to sleep. The defendant walked out of the victim's bedroom and partially closed the door. The victim watched him walk through the kitchen toward her brother's bedroom. The window in her brother's room was wide open. No one else in the house was aware of the defendant's presence. The victim's sisters remained asleep, and her brother heard nothing.

The victim's mother had awakened at approximately 3:20 a.m., gone into the kitchen to get a bottle to feed her infant, and returned to her bedroom. She saw no one in the apartment at that time. Later, when the victim's mother went back to the kitchen, she saw the victim standing at her bedroom door. The victim, shaking with fright, ran into the kitchen and stated that there was a "black guy" in her room. When the victim and her mother entered the victim's bedroom, they saw the defendant peering in the window from the front porch. The victim's mother had never seen the man before. He had dark skin and a braid hanging out of his hoodie. The defendant ran toward the back of the house. The victim's mother tried to pursue him, but she could not keep up with him.

The victim told her mother what the defendant had done to her. When the victim went to the bathroom, she saw a clear, wet substance on her vagina and asked her mother if she could wash. The victim's mother, who was medically trained, recognized the presence of semen in her daughter's underwear. She instructed the victim not to wipe off anything. The police were summoned.

The victim was taken by ambulance to Midstate Medical Center in Meriden, but because Midstate Medical Center does not perform rape kits on children, she was transported to Yale-New Haven Hospital where Deborah Jane Gallagher, a nurse, administered a rape kit. Gallagher used swabs to obtain DNA samples from the victim's vagina and fourchette, which was torn. Gallagher also took a sample of the victim's blood that would be used to compare the victim's DNA with the DNA collected on the swabs. At the conclusion of the examination, the victim went to the Department of Children and Families' child sexual abuse clinic on Long Wharf Drive in New Haven, where she was interviewed. During the forensic interview, the victim described the perpetrator as having a scratch on his left cheek, clean shaven, and approximately forty years old. The defendant was twenty-three years old and had a full beard and mustache when he was arrested two days later.

The police searched the victim's apartment, focusing their attention on her bed and two windows in her brother's room. They were able to lift fingerprints from the windows, but some of the fingerprints were insufficiently defined to be evaluated. Other fingerprints did not match the defendant's or those of anyone in the

police database.[4]

The police identified the defendant, an African-American man with short dreadlocks, as a suspect and arrested him in Waterbury on October 17, 2014. At the time of the defendant's arrest, the police obtained a sample of the defendant's DNA from the inside of his cheek.

Daniel T. Renstrom, a DNA analyst at the state forensics laboratory, testified about his analysis of the DNA samples that were sent to the laboratory. He developed profiles of the victim's and the defendant's DNA, and a profile of the DNA on the swabs of the victim's vagina and fourchette. Renstrom divided the DNA samples from the victim's vagina and fourchette into two components, an epithelial or nonsperm-rich fraction and a sperm-rich fraction. He compared the two fractions to DNA profiles of the victim and the defendant. The swab of the victim's fourchette contained a mixture of DNA, that is, DNA from more than one contributor. Renstrom determined that the victim was the source of the epithelial fraction from the DNA sample from her fourchette, but he could not identify the other contributor due to an insufficient amount of DNA. Pursuant to the laboratory's policy, Renstrom eliminated the defendant as a DNA contributor to the DNA mixture from the victim's fourchette.

The DNA profile obtained from the swab of the victim's vagina also produced a mixed DNA profile. The swab contained both saliva and spermatozoa. The victim was a contributor to the epithelial fraction. The sperm-rich fraction contained a mixture of DNA from both the victim and the defendant.[5] The number of people who have the DNA profile that was identified as the defendant's is approximately one in 52 million in the African-American population, one in 37 million in the Hispanic population, and one in 66 million in the Caucasian population.

The defendant was charged in a long form information with home invasion in violation of § 53a-100aa (a) (1), three counts of sexual assault in the first degree in violation of § 53a-70 (a) (2), and one count of risk of injury to a child in violation of § 53-21 (a) (2). On December 15, 2016, a jury returned a verdict of guilty on all counts charged. Thereafter, the defendant filed a motion for a judgment of acquittal as to his conviction of home invasion[6] and a motion for a new trial on the ground of prosecutorial impropriety.[7] The court denied both motions. On February 24, 2017, the court sentenced the defendant to an effective term of sixty-five years imprisonment. The defendant appealed.

I

The defendant first claims that the state failed to present sufficient evidence for the jury to find that he intended to commit a sexual assault by force at the

time he entered the victim's home, as was required to convict him of home invasion. We disagree.

The state alleged in count one of the long form information that on or about October 15, 2014, at approximately 3:41 a.m., the defendant "unlawfully entered a dwelling, while a person other than a participant in the crime (to wit: [the victim]) was actually present in such dwelling, with intent to commit a crime therein (to wit: Sexual Assault in the First Degree [§] 53a-70 [a] [1]),[8] and, in the course of committing the offense: he committed a felony against the person of another person other than a participant in the crime who was actually present in such dwelling, said conduct being in violation of [§] 53a-100aa (a) (1) of the Connecticut General Statutes."[9] (Footnote added.)

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Brown*, 299 Conn. 640, 646–47, 11 A.3d 663 (2011).

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [w]here a group of facts are relied upon for proof of an element of the crime it is [its] *cumulative impact* that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 65–66, 43 A.3d 629 (2012).

"Furthermore, [i]t is immaterial to the probative force of the evidence that it consists, in whole or in part, of circumstantial rather than direct evidence." (Internal quotation marks omitted.) Id., 66. In fact, "circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." (Internal quotation marks omitted.) *State* v. *Sienkiewicz*, 162 Conn. App. 407, 410, 131 A.3d 1222, cert. denied, 320 Conn. 924, 134 A.3d 621 (2016). "If evidence, whether direct or circumstantial, should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." (Internal quotation marks omitted.) *State* v. *Jackson*, 257 Conn. 198, 206, 777 A.2d 591 (2001).

"Intent is a mental process, and absent an outright declaration of intent, must be proved through inferences drawn from the actions of an individual, i.e., by circumstantial evidence. . . . The intent of the actor is a question for the trier of fact, and the conclusion of the trier in this regard should stand unless it is an unreasonable one." (Citation omitted; internal quotation marks omitted.) *State* v. *Barnes*, 99 Conn. App. 203, 212, 913 A.2d 460, cert. denied, 281 Conn. 921, 918 A.2d 272 (2007).

On the basis of our review of the evidence, we conclude that there was sufficient evidence presented for the jury reasonably to conclude that the defendant unlawfully entered the victim's dwelling with the intent to commit the crime of sexual assault by use of force. The evidence that permitted such an inference included, among other things, the location of the victim's bedroom window above the porch; the failure of the victim's mother to see the defendant in the dwelling when she went to the kitchen at 3:20 a.m.; the defendant's having gone to the victim's bedroom and awakened her; the defendant's having asked the victim her age and telling her that "this wouldn't hurt"; the defendant's having put a pillow over her face and having sexually assaulted her; the defendant's having threatened to kill the victim if she told anyone what he had done; his leaving the scene of the assault immediately by walking through the kitchen and exiting the window in the brother's bedroom; the lack of evidence of another crime having been committed in the dwelling; and the victim's viewing the defendant peering into her bedroom window after he exited the dwelling.

The foregoing, along with the evidence in its entirety, permitted the jury reasonably to conclude that the defendant entered the apartment to sexually assault the victim by force. The jury reasonably could have inferred that the defendant had been observing the dwelling and knew the layout of the apartment, knew the family's sleeping habits, and had been watching the victim through her bedroom window. The defendant acknowledges that there was evidence that he entered the vic-

tim's dwelling through her brother's bedroom window. The defendant knew how to get from the brother's room to the victim's bedroom and went directly to the victim, not one of the sisters. He asked her age and told her that "this wouldn't hurt . . . ." He was in the apartment for a short period of time, disturbed no one but the victim, committed no other crime, and immediately left after sexually assaulting the victim. "Common experience tells us that an unlawful entry into a dwelling at night is not without purpose. Nor are people accustomed to enter homes of strangers through a window for innocent purposes." *State* v. *Zayas*, 195 Conn. 611, 617, 490 A.2d 68 (1985).

The jury reasonably could have inferred that the manner in which the defendant entered the victim's dwelling and carried out his sexual assault of her was circumstantial evidence that, when he entered the dwelling, he had the intent to commit a sexual assault. The single-mindedness with which the defendant entered the dwelling, proceeded to the victim's bedroom, and sexually assaulted her against her will is compelling evidence of this intent. See *State* v. *Barnes*, supra, 99 Conn. App. 203. *Barnes* is a case in which the defendant was charged with, among other things, burglary in the third degree. Id., 204. On appeal, the defendant, Antonio G. Barnes, claimed that the state had presented insufficient evidence to convict him of burglary because there was insufficient evidence that "he intended to commit a crime when he entered the [apartment]." Id., 212. The evidence demonstrated that Barnes entered that victim's apartment without consent, took her cellular telephone, and struck her. Id. He grabbed the victim's "arms so that she could not move and, in response to her statement to [a third party] to telephone the police, stated that he would be able to hit [the victim] before the police arrived." Id., 212–13. This court construed "the evidence in the light most favorable to sustaining the verdict" and "concluded that the evidence established that at the time of entering the dwelling, [Barnes] intended to commit the crime of assault against [the victim]." Id., 213.

In the present case, the defendant argues that the state failed to produce sufficient evidence that he had formed the intent to commit a sexual assault by force when he entered the dwelling. This argument is predicated on the prosecutor's summation that did not marshal evidence demonstrating the defendant's intent when he entered the dwelling. The defendant has provided no legal support for the singular proposition that the prosecutor was required to marshal the evidence in any particular manner, and we are unaware of any Connecticut law requiring the state to marshal its evidence as the defendant suggests. Moreover, it is well known, as the jury was instructed in the present case, that the arguments of counsel are not evidence and that it is the jury's recollection of the evidence that is

controlling. See, e.g., *Brown* v. *Bridgeport Police Dept.*, 155 Conn. App. 61, 86, 107 A.3d 1013 (2015); *State* v. *Spyke*, 68 Conn. App. 97, 113, 792 A.2d 93, cert. denied, 261 Conn. 909, 804 A.2d 214 (2002). The court also instructed the jury that it may not resort to speculation or conjecture and that its verdict had to be predicated on the evidence.

The defendant has not persuaded us that the jury decided the present case on anything other than the evidence before it. As previously noted, on the basis of its everyday experience and the evidence, the jury reasonably may have inferred that the defendant entered the dwelling with the intent to sexually assault the victim by means of force. See, e.g., *State* v. *Morocho*, 93 Conn. App. 205, 215, 888 A.2d 164 (jury reasonably may have inferred, on basis of everyday experience and evidence presented, that by entering victim's bedroom, lying on top of her while attempting to kiss and touch her all over her body, defendant took substantial step in line of conduct that would culminate in sexual intercourse), cert. denied, 277 Conn. 915, 895 A.2d 792 (2006). It defies common sense and experience to believe that the defendant thought that the victim willingly would have been open to his sexual predation, such that he believed that he would not need to use the threat of force to sexually assault her.

For the foregoing reasons, we conclude that there was sufficient evidence to support the defendant's conviction of home invasion and that the trial court properly denied the defendant's motion for a judgment of acquittal on the count of home invasion.

II

The defendant claims that the prosecutor's closing argument was improper and therefore (1) deprived him of his constitutional right to be heard by counsel at the close of evidence, (2) deprived him of his constitutional right to a fair trial, and (3) entitled him to a new trial.[10] More specifically, he claims that by presenting her substantive discussion of the evidence during the rebuttal portion of her summation, the prosecutor prevented his counsel from knowing how the state intended to marshal the evidence and, therefore, counsel could not effectively rebut the state's position during his closing argument. He also claims that, during rebuttal argument, the prosecutor mischaracterized the evidence and introduced new claims that his counsel could not correct, and thus deprived him of a fair trial. Finally, the defendant claims that because the prosecutor reserved the substantive portion of her argument for rebuttal, he is entitled to a new trial. We disagree with each of the defendant's claims.

The defendant did not object to the prosecutor's argument on the grounds he has raised on appeal.[11] He seeks appellate review pursuant to *State* v. *Golding*, 213 Conn.

233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Although trial counsel's failure to object to the prosecutor's argument is not fatal to the defendant's appellate claims, it suggests that trial counsel did not believe that the argument was improper. *State* v. *Chase*, 154 Conn. App. 337, 343–44, 107 A.3d 460 (2014), cert. denied, 315 Conn. 925, 109 A.3d 922 (2015). We agree that the defendant's claims are reviewable because the record is adequate for review and the claims are of constitutional magnitude. See *State* v. *Golding*, supra, 239. The defendant, however, cannot prevail, as no constitutional violations exist, and the prosecutor's final argument did not deprive him of his constitutional rights. See id., 240.

We begin our analysis of the defendant's claims by setting forth the standard of review. "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 275, 973 A.2d 1207 (2009). "In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . . The defendant also has the burden to show that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Brett B.*, 186 Conn. App. 563, 573,    A.3d    (2018), cert. denied, 330 Conn. 961,    A.3d    (2019).

Our Supreme Court "has acknowledged: [P]rosecutorial [impropriety] of constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Otto*, supra, 305 Conn. 76.

"While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly ham-

pered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 38, 100 A.3d 779 (2014). "A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citations omitted.) *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002). "The prosecutor's office caries a special prestige in the eyes of the jury. . . . Consequently, [i]t is obligatory for prosecutors to find careful ways of inviting jurors to consider drawing argued inferences and conclusions and yet to avoid conveying the impression that they are giving their personal views to the jurors." (Citations omitted; internal quotation marks omitted.) Id., 722.

The defendant's claims arise out of the prosecutor's closing argument, which consisted of two parts. We first outline the final arguments of both the prosecutor and defense counsel to provide a context in which to consider the defendant's claims. The prosecutor began the first portion of her summation by thanking the jurors for their service and then stated that she intended "to highlight" some of the evidence, but that the jury's recollection of the facts was what counted. She also stated that she was going to "highlight some points of law," but that the judge was going to instruct the jury on the law and "his word goes . . . ." She then summarized the evidence concerning the events that occurred in the victim's home during the night of October 15, 2014. Given those facts, she stated that the state charged the defendant with home invasion, three counts of sexual assault in the first degree, and risk of injury to a child. The prosecutor then stated: "The judge will give you the exact definition of these crimes at much more length than I will, and you will actually get the copy of his instructions to take with you in the jury room, but I'd like to summarize them briefly for you."

The prosecutor read the first count of the long form information charging the defendant with home invasion. She stated thereafter that the "statute is very wordy, but basically, it means that the defendant had to unlawfully enter the dwelling while a person was inside with the intent to commit a sexual assault and commit a felony while inside against another person . . . ." The prosecutor then addressed each of the three counts of sexual assault and risk of injury to a child with which the defendant was charged. She reminded the jury that the "judge, again, will have more detailed instructions and you will have them in the jury room with you . . . ."

She concluded the first portion of her final argument by stating that the jury was going to hear from the defendant, particularly about fingerprints and mistakes made by the laboratory and the police, and that the victim and the victim's mother were unable to identify the perpetrator of the crimes from photographs or in court. Finally, she stated that you "will hear all of these things and more from the defense, but while you are listening to their argument, there are three letters you will not be able to forget. There are three letters you will not be able to get out of your head. Those letters are DNA."

Counsel for the defendant then presented his closing argument. He made a few general remarks and stated that it was the jury's recollection of the facts, not his, that mattered. He stated that he only had one chance to address the jury. He acknowledged the seriousness of the facts, and that the jury surely wanted justice for the victim and "to believe that the Meriden police got the right man." He also reminded the jurors that they had acknowledged during voir dire that "the verdict would have to be not guilty" if the state had not proved the case beyond a reasonable doubt.

He argued that the "majority of evidence in this case contradicts a piece of evidence that implicates the defendant." He asked the jury to consider three things: how much contradictory evidence there was, whether the evidence against the defendant was corroborated, and whether the evidence pointing the finger at the defendant was solid or problematic. He noted that there was no courtroom identification of the perpetrator and that the victim's description of the perpetrator did not "line up" with the defendant's appearance in four ways: the victim testified that the perpetrator had no facial hair, had a scar on his cheek, was dark-skinned, and was forty years old. He pointed out that when the defendant was arrested, he had a full beard and was twenty-three years old. A photograph of the defendant taken at the time of his arrest depicts no scar and indicates that he is not dark-skinned.

With respect to fingerprints on the window in the brother's room, counsel for the defendant argued that the victim saw the perpetrator go back to her brother's room, and her mother discovered the window wide open. "It seems logical given the bulkhead or Bilco door that that's the window that the perpetrator went into. It's also logical that if you're pushing the window up, you might leave some prints there. . . . Could you imagine if his prints were found on that window, what we'd be looking at? . . . But those prints, he's excluded from leaving those prints; they're not his." "The state wants you to believe that maybe the kids were out there playing. They're not kids' prints. You heard the experts testify about that. *A hundred years?* The windows were there forever? I mean, come on,

let's be serious." (Emphasis added.) He stated that the lack of evidence in terms of fingerprints was important.

Defense counsel also asked what corroborated the DNA evidence in the case and answered his own question, "[n]othing." He argued that there was no evidence that the sperm slide or the victim's panties or her sheets were tested, as those items were not sent to the laboratory. He urged the jury to listen to the judge's instructions that it was not the defendant's burden to put on evidence. Nonetheless, the defendant had called the detectives in the case to testify. The state called only the victim, her mother, the forensic interviewer, the nurse and doctor, and the laboratory scientists to testify.

Defense counsel further addressed the DNA evidence, arguing why it was problematic. In the profile developed from one swab source, the defendant was eliminated as a contributor, but he was a contributor in a profile from another source. Defense counsel noted the inconsistent number of swabs. "So, the one [source] that has the most seminal fluid, the one that results in the smear with the sperm, he's eliminated from. That's problematic. This is not a reliable result. If a result is unreliable, then statistics mean nothing." Defense counsel also talked about mistakes the police made in recording and storing the fingerprints, and argued that Gallagher's testimony about the number of swabs in a rape kit was not consistent with the number of swabs sent to the laboratory. He concluded that the lack of evidence did not permit the jury to accept the reliability of the DNA evidence. He urged the jury not to decide the case on "blind faith . . . ."

On rebuttal, the prosecutor argued that the state was not asking the jury to decide the case on blind faith, but on science. She pointed out that the defendant did not leave his fingerprints on the window, but that he left "evidence from another part of his body," which "resulted in a DNA profile that only one in 52 million people in the African-American community have."

With respect to fingerprints, she stated that they "tell you nothing." There were fingerprints on the window, but "[w]e don't know where the prints came from or how long they've been there or if they've been there for a hundred years. The prints tell us nothing and show you nothing and prove nothing."

The prosecutor restated the victim's testimony regarding the incident on October 15, 2014. She reviewed the victim's description of the perpetrator and displayed photographs of the defendant that were in evidence. She also reviewed the testimony of the victim's mother. She recounted the testimony of Gallagher and Gunjan Tiyyagura, an emergency department physician who described shining a BlueMax light on the victim's vagina that revealed the presence of semen.

She recounted in summary the testimony regarding the forensic interview of the victim, and gave a more detailed recitation of the testimony of the laboratory scientists regarding the swabs and the DNA profiles produced from them. She mentioned that Renstrom developed known DNA profiles of both the victim and the defendant, and compared them with the profile obtained from the swab of the victim's vagina. The DNA of both the victim and the defendant were present in that profile. She stated that Renstrom "attached a statistic to the [number] of times you would see that profile in a number of people. He told you that you would see the DNA profile of the defendant once in 52 million people in the African-American community. Think about that, ladies and gentlemen. You hear evidence that the whole state of Connecticut is 3.5 million people. If we filled the entire state of Connecticut with 3.5 million African-Americans, 52 million African-Americans would be the population of Connecticut times fourteen. So, if we placed 3.5 million African-Americans in Connecticut and stacked thirteen more states the size of Connecticut on top of that full of African-Americans, we would still only see that profile one time. That, ladies and gentlemen, is proof beyond a reasonable doubt."

We now address the defendant's claims of prosecutorial impropriety.

A

The defendant's first claim of prosecutorial misconduct is that the prosecutor violated his constitutional right to be heard by counsel during oral argument by reserving the substantive discussion of the evidence for her rebuttal. He argues that, without knowing how the state intended to marshal the evidence, his counsel could not effectively rebut the state's argument and, therefore, he lost his "last clear chance to persuade the [jury] that there may be reasonable doubt of [his] guilt," quoting *Herring* v. *New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975). He also claims that the prosecutor raised new arguments during her rebuttal.[12] We disagree.

"Under the sixth and fourteenth amendments to the United States constitution, a criminal defendant has a constitutionally protected right to make a closing argument. That right is violated not only when a defendant is completely denied an opportunity to argue before the court or the jury after all the evidence has been admitted, but also when a defendant is deprived of the opportunity to raise a significant issue that is reasonably inferable from the facts in evidence." (Internal quotation marks omitted.) *State* v. *Mungroo*, 104 Conn. App. 668, 675–76, 935 A.2d 229 (2007), cert. denied, 285 Conn. 908, 942 A.2d 415 (2008).

"In general, the scope of final argument lies within

the sound discretion of the court . . . subject to appropriate constitutional limitations." (Citation omitted; internal quotation marks omitted.) *State* v. *Arline*, 223 Conn. 52, 59, 612 A.2d 755 (1992). The present case, however, is not one in which the defendant claims that the court improperly limited his right to argue to the jury. He instead takes issue with the prosecutor's strategy, claiming that because the prosecutor made her substantive argument during rebuttal, defense counsel could not counter the substance of the prosecutor's argument. Our review of the record discloses that the evidence was known to the defendant and his counsel, and that defense counsel vigorously argued the weaknesses in the state's case to the jury.

The defendant relies heavily on the legal underpinnings of *Herring* v. *New York*, supra, 422 U.S. 853, to argue that the form of the prosecutor's argument limited his right to counsel under the sixth amendment to the federal constitution. The facts of *Herring* are inapposite. At the time of *Herring*, a New York statute conferred upon judges in nonjury criminal trials the power to deny counsel an opportunity to argue the evidence before the judge rendered a judgment. Id., 853–54. The case called upon the Supreme Court to assess the constitutional validity of the New York law. Id., 854. During trial, at the conclusion of evidence, defense counsel had asked "to 'be heard somewhat on the facts.' The trial judge replied: 'Under the new statute, summation is discretionary, and I choose not to hear summations.' " Id., 856. The United States Supreme Court reversed the defendant's conviction, stating in part, that "closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial. . . . [C]ounsel for the defense has a right to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge." Id., 858. "[T]he overwhelming weight of authority, in both federal and state courts, holds that a total denial of the opportunity for final argument in a nonjury criminal trial is a denial of the basic right of the accused to make his defense." Id., 859.

*Herring* does not resemble the present case—or anything close to it.[13] First, the present case was tried before a jury. Second, the court did not deny defense counsel the opportunity to make a final argument to the jury. Third, defense counsel argued to the jury. Our review of the argument made by defense counsel discloses that he reminded the jury that it was its recollection of the facts that mattered and that he had only one opportunity to address the jury, although the prosecutor had two such opportunities. He ably pointed out the weaknesses in the state's case: the victim and her mother were unable to identify the perpetrator in court or from photographs, the victim's description of the perpetrator was not consistent with his appearance, there was no fingerprint evidence from the window where the perpe-

trator supposedly entered the dwelling, the DNA evidence was uncorroborated, and the nurse used two swabs to collect DNA from the victim but there were three swabs in the rape kit in the laboratory, among other things. Significantly, defense counsel argued that the DNA evidence was unreliable and that the state should not be entitled to rely on it.

Contrary to the defendant's argument, defense counsel was able to address the evidentiary issues in the case that formed the basis of both portions of the prosecutor's final argument. Defense counsel's argument with regard to the evidence directly attacked statements the prosecutor made during her summation, to wit: "[Y]ou're going to hear a lot of things about fingerprints and mistakes by the lab or police with those fingerprints. You're also going to hear that there's no identification of the defendant by photograph. . . . [W]hile you are listening to their argument, there are three letters you will not be able to forget. There are three letters you will not be able to get out of your head. Those letters are DNA." The arguments of both the prosecutor and defense counsel demonstrate that each of them was well aware of the evidence in the case and the opposing party's theory of the case.

This court previously has stated that "[t]here is nothing to suggest that a closing argument must be made in a particular order or that the state's initial argument should contain the majority of its argument. Closing arguments must be fair and based on evidence. . . . We . . . must permit the state wide latitude in its decision to make the substantive portion of its closing argument during final closing argument . . . ." *State* v. *Rupar*, 86 Conn. App. 641, 656–57, 862 A.2d 352 (2004), cert. denied, 273 Conn. 919, 871 A.2d 1030 (2005); accord *State* v. *Schiavo*, 93 Conn. App. 290, 303 n.10, 888 A.2d 1115, cert. denied, 277 Conn. 923, 895 A.2d 797 (2006). As in *Rupar*, the defendant in the present case has not identified any controlling authority—be it a statute, a rule of practice, or case law—regarding the use of time in closing argument.[14] We, therefore, conclude that the format of the prosecutor's closing argument was not improper and did not deny the defendant his constitutional right to be heard by counsel during closing argument.

B

The defendant's second claim is that the prosecutor was guilty of impropriety when, during rebuttal argument, she raised new issues and mischaracterized the evidence that, according to the defendant, infringed on his right to closing argument and deprived him of a fair trial.[15] On the basis of our review of the record, including the prosecutor's rebuttal argument, we conclude that there was no impropriety.[16] We now address each of the defendant's arguments.

The defendant claims that the prosecutor mischaracterized Renstrom's testimony regarding the expected frequency of individuals who could be a contributor to the mixture in the DNA sample identified as 1 C-B. We disagree.

During her rebuttal argument, the prosecutor stated in relevant part: "[I]f we placed 3.5 million African-Americans in Connecticut and stacked thirteen more states the size of Connecticut on top of that full of African-Americans, we would still only see that profile one time. That, ladies and gentlemen, is proof beyond a reasonable doubt." The defendant notes that Renstrom testified that the population of Connecticut is approximately 3.5 million and that "the expected frequency of individuals who could be a contributor to the mixture in 1 C-B is approximately one in 52 million in the African-American population, approximately one in 66 million in the Caucasian population, and approximately one in 37 million in the Hispanic population."

The defendant claims that the prosecutor's argument implicates two errors in probabilistic reasoning. By telling the jury that only one person in Connecticut would be included as a contributor, the prosecutor urged the jury to commit the " 'uniqueness fallacy,' "[17] stating that "it is a fallacy to infer uniqueness from profile frequencies simply because they are smaller than the number of available objects."[18] The second error, the defendant argues, is "the probability of another match error, which conflates the chance that a single, randomly selected person could be included as a contributor with the chance that at least one other member of the population could be included."[19] The defendant contends that the prosecutor's incorrect reasoning was harmful because even a relatively low percentage chance that someone else could be included as a contributor may have been enough to convince the jury that there was a reasonable doubt as to the defendant's guilt.

We need not determine whether the defendant's statistical argument is correct. He presented no evidence to support the claim he now raises on appeal, and the record is inadequate to address it. Our review of the record discloses that the prosecutor's argument was predicated on the evidence. On redirect examination, the prosecutor questioned Renstrom about the frequency of the defendant's DNA profile occurring in the African-American population in Connecticut:

"[The Prosecutor]: How many people are in the state of Connecticut?

"[The Witness]: I'm not sure of the exact population. I believe it's in the three to three and a half million people.

"[The Prosecutor]: Three, three and a half million. This statistic was what . . . you found the amount—

the number of times you would expect to find this profile of—that was generated from the defendant's known? How many times would you expect to see that profile within—what was the statistic you put out? . . .

"[The Witness]: It was in the tens of millions. . . .

"[The Prosecutor]: So, demonstrate the item 1C-B is a mixture, and the defendant is included in one statistic that you put to this, that you would find the defendant's profile in that number?

"[The Witness]: So, what the statistic is referring to is, if I were to take general population, type those people, and then compare it to the knowns, 1C-B—or the unknown 1C-B sample, and the expected frequency of individuals who could be a contributor to that sample, 1C-B, is one in 52 million in the African-American population, one in 66 million in the Caucasian population, and one in 37 million in the Hispanic population."

DNA evidence is inherently complex, and the statistical conclusions to be drawn from it are equally complex. But neither the state nor the defendant presented expert testimony to help the jury understand the significance of Renstrom's statistics. "The purpose of expert testimony is to aid the trier of fact in arriving at its own conclusion." *Breen* v. *Breen*, 18 Conn. App. 166, 174, 557 A.2d 140, cert. denied, 212 Conn. 801, 560 A.2d 984 (1989). "The purpose of expert testimony is to draw inferences from the facts which the fact finder could not draw at all or as reliably." *Marandino* v. *Prometheus Pharmacy*, 105 Conn. App. 669, 692, 939 A.2d 591 (2008), rev'd in part on other grounds, 294 Conn. 564, 986 A.2d 1023 (2010).

As previously noted, the defendant failed to object to the prosecutor's DNA argument. As our Supreme Court has stated, this is not fatal to a prosecutorial impropriety claim. See *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). "This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time. . . . This is particularly true if, as in the present case, a defendant claims prosecutorial impropriety stemming from a prosecutor's discussion of DNA evidence. Such discussions require precise and nuanced distinctions in nomenclature that easily may be misconveyed or misunderstood, especially in light of the zealous advocacy that is part and parcel of a closing argument. If a prosecutor's arguments do not portray accurately the DNA evidence as it was presented to the jury or stray too far from reasonable inferences that

may be drawn from such evidence, a contemporaneous objection by defense counsel would permit any misstatements, whether inadvertent or intentional, to be remedied immediately." (Citation omitted; internal quotation marks omitted.) *State* v. *Brett B.*, supra, 186 Conn. App. 572.

The state contends that the prosecutor's argument was predicated on a reasonable inference to be drawn from the evidence and unmistakably was in reference to Renstrom's testimony. We agree. "We long have held that a prosecutor may not comment on evidence that is not a part of the record and may not comment unfairly on the evidence in the record. . . . It is not, however, improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We previously have held that, if the evidence presented at trial is that the defendant is included as a contributor to a DNA profile, then it is not necessarily improper for a prosecutor to argue to a jury during closing argument that the DNA found was the defendant's as long as that is a reasonable inference to be drawn in light of the evidence as a whole." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 583.

To the extent that the prosecutor may have used an imprecise example or exaggerated,[20] the defendant failed to object or to correct the claimed misstatement, which suggests "that he did not believe at the time that the remarks warranted such intervention. When considered within the context of the state's entire argument and allowing some leeway for zealous advocacy, as we must, we cannot conclude that the prosecutor made any statements that reasonably can be viewed as improper under the circumstances or that the jury likely was misled . . . ." Id., 585–86. As a practical matter, some degree of imprecision can be expected when a layperson discusses, or evaluates, scientific or statistical evidence without the benefit of expert testimony. Opposing counsel, however, must be alert and raise an objection at the time when a purported error may be corrected. See id., 572.

We conclude, therefore, that the prosecutor's rebuttal argument was not improper and that the defendant failed to demonstrate that he was denied a fair trial on the basis of the prosecutor's argument with respect to the DNA evidence.

### 2

The defendant also claims that the prosecutor mischaracterized the fingerprint evidence. We do not agree.

During the trial, the state presented testimony from John Cerejo, a detective with the Meriden Police Department, and Steve Burstein, a detective sergeant with the department, regarding the efforts the police made to get fingerprints from the window in the bed-

room of the victim's brother. Many of the fingerprints were not sufficiently clear to be used for identification purposes, and none of them matched the defendant's fingerprints. According to Cerejo, the length of time a fingerprint stays on a surface depends on, among other things, whether it is exposed to sun and rain. He testified inconsistently as to how long the fingerprints on the window could have been there. According to Burstein, the window was exposed to the elements, and he did not know how long the fingerprints were on the window. He also testified that he did not know when the house had been built, but estimated, without objection, that it "probably [was] a hundred years ago or so . . . ."

During her rebuttal, the prosecutor downplayed the importance of fingerprints on the window, arguing, in part, "[w]e don't know where the prints came from or how long they've been there or if they've been there for a hundred years." The defendant claims that the argument was improper because there was no evidence that the fingerprints could have been on the window for anywhere close to one hundred years. We do not find the prosecutor's argument to have been improper. The obvious point of the prosecutor's argument was that there was no evidence as to whose fingerprints were on the window or when they happened to be put there. With a hyperbolic flourish, the prosecutor incorporated the testimony that the house was estimated to be one hundred years old to emphasize that no one knew when or who put fingerprints on the window. Surely, the jury understood the prosecutor's remark as an overstatement. Moreover, counsel for the defendant stated in his closing argument: "They're not kids' prints. You heard the experts testify about that. A hundred years? The windows were there forever? I mean, come on, let's be serious."

Whether the prosecutor's one hundred years remark was hyperbole or made in response to the argument of defense counsel, the arguments of both counsel had a basis in the evidence. Most importantly, there was no fingerprint evidence that connected the defendant to the crimes and, therefore, he could not have been prejudiced by the argument. The defendant's claim of prosecutorial impropriety during oral argument therefore fails.

C

The defendant also claims that he is entitled to a new trial because the prosecutor's allegedly improper rebuttal argument deprived him of the right to closing argument. We do not agree.

The defendant's claim is made through the lens of hindsight and is not supported by the record. The defendant expounds on his claim that he did not have a chance to rebut the state's view of the evidence, and that his theory of defense was to challenge the persua-

siveness and reliability of the DNA evidence. He asserted that he was denied the right to final argument especially with respect to the prosecutor's rebuttal argument that he was the only person in Connecticut who could be a contributor to the DNA mixture and that defense counsel was not given an opportunity to correct the argument. The defendant claims that this was extraordinarily harmful because juries, lawyers, and judges have a difficult time interpreting probabilistic information. This claim was not raised at trial and, therefore, is not preserved. Moreover, the defendant claims that he did not have the chance to counter the prosecutor's argument in the context of his own theory that there were serious questions about the collection, preservation, and testing of the physical evidence that called Renstrom's testimony into question.

The defendant's contention that he is entitled to a new trial on the basis of the prosecutor's rebuttal argument is flawed for at least two reasons. If, as he argues on appeal, the prosecutor's argument that he was the only person in Connecticut who could have contributed to the DNA mixture is wrong, defense counsel could have objected to the argument at trial, but did not. Counsel, therefore, must not have thought that it misled the jury. Given the complexity of DNA evidence, an objection must be raised at the time evidence is presented when it can be corrected. *State* v. *Brett B.*, supra, 186 Conn. App. 572.

As to his second contention that defense counsel could not counter the prosecutor's DNA argument, we note that at the conclusion of the first portion of her summation, the prosecutor, in so many words, told the jury that DNA was the key to the case. During his final argument, defense counsel made clear to the jury all of the problems in the collection, preservation, and testing of the DNA evidence. The defendant, therefore, was not deprived of his right to final argument and to present his view of the DNA evidence. In fact, defense counsel anticipated and attempted to refute the prosecutor's rebuttal.

For the foregoing reasons, the defendant's claim of prosecutorial impropriety during final argument fails.

### III

The defendant's final claim is that he is entitled to a new trial on the charge of home invasion because the second portion of the prosecutor's final argument misled the jury on the elements of the crime of home invasion, and that the misstatement was not harmless beyond a reasonable doubt. We disagree.

The defendant's claim is predicated on his representation, in his appellate brief, of a portion of the prosecutor's closing argument, to wit: "During closing argument, after quoting the substitute information, the state's attorney told the jury that 'basically, [the infor-

mation] means that the defendant had to unlawfully enter the dwelling while a person was inside *with the intent to commit a sexual assault . . . .'* " (Emphasis in original.) He argues that the language misrepresented the law to the jury because it invited the jury to find him guilty even if it did not find beyond a reasonable doubt that he intended to commit a sexual assault by force at the time of entry. The defendant correctly states that prosecutors are not permitted to misstate the law because it invites a conviction unwarranted by the law and facts.[21] See *State* v. *Otto*, supra, 305 Conn. 77. "A review of the statements made by the prosecutor, in the context of the entire closing argument, is necessary to address the defendant's challenges." Id.

Our review of the prosecutor's entire summation discloses the context of the prosecutor's argument to which the defendant takes exception. After thanking the jury for its service, the prosecutor stated that she intended to highlight some of the evidence, but that if the jury had a different recollection of the evidence, its recollection was what counted. She also stated that she would highlight some points of law, but that *the trial judge would give the jury instructions on the law and that "his word goes . . . ."* (Emphasis added.)

The prosecutor then summarized the victim's testimony and stated that on the basis of "the horrific facts" the victim described, the state charged the defendant with five crimes. The prosecutor stated: "The judge will give you the exact definition of these crimes at much more length than I will, and you will actually get the copy of his instructions to take with you in the jury room, but I'd like to summarize them briefly for you." The prosecutor then read the first count of the long form information to the jury. Immediately thereafter, the prosecutor stated: "That statute is very wordy, but basically, it means that the defendant had to unlawfully enter the dwelling while a person was inside with the intent to commit a sexual assault and commit a felony while inside against another person; and again, this will be described further, but that's the first count of the information."

When the court instructed the jury, it stated in part: "You as the jury and I as the judge have separate functions. It's your function to find what the facts are in this case. With respect to the facts, you and you alone are charged with that responsibility. My function is to charge you on the law to be applied to the facts that you find in order to decide this case. With respect to the law, what I say to you is binding on you, and you must follow all of my instructions."

With respect to the first count of the information, which alleged home invasion, the court instructed the jury that it would have the information in the jury room along with a copy of its charge. The court read the charge of home invasion to the jury and § 53a-100aa

(a) (1). It then stated: "So, for you to find the defendant guilty of this charge, the state must prove each of the following elements beyond a reasonable doubt: (1) that the defendant knowingly and unlawfully entered a dwelling, (2) that the defendant intended to commit the crime of sexual assault in the first degree in violation of § 53a-70 (a) (1) in that dwelling, (3) that when the defendant entered the dwelling, a person other than a participant in the crime, namely [the victim], was actually present in the dwelling, and (4) that in the course of committing the home invasion, the defendant committed a felony against the person of another person other than a participant in the crime who was actually present in the dwelling."

The court elaborated on all of the elements of the crime of home invasion: "The second element that the state must prove beyond a reasonable doubt is that the defendant intended to commit the crime of sexual assault in the first degree in violation of § 53a-70 (a) (1) in the dwelling. Our statutes provide that a person acts intentionally with respect to a result when his conscious objective is to cause such result. What a person's intent has been is very largely a matter of inference. No witness can be expected to come here and testify that he looked into another person's mind and saw therein a certain intention. A jury may determine what a person's intention was at any given time by determining what that person's conduct was and what the circumstances were surrounding that conduct, and from those things infer what his intention was. An intent may be inferred from circumstantial evidence, provided the inference is a reasonable one and warranted by facts that you find proven. To draw such an inference is not only the privilege but also the proper function of a jury, provided of course, that the inference drawn complies with the standards for inference set forth in my instruction on circumstantial evidence."

The trial court also instructed the jury on the elements of sexual assault in the first degree by the use of force, to wit: "The necessary intent to commit a crime must be an intent to commit either a felony or a misdemeanor in addition to the unlawful entering of the dwelling. In this case, the state claims that the defendant committed the crime of sexual assault in the first degree in violation of § 53a-70 (a) (1) . . . . That section provides . . . [a] person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person. For a person to intend to commit the crime of sexual assault in the first degree in violation of § 53a-70 (a) (1) . . . he must intend to (1) compel another person to engage in sexual intercourse, and (2) to accomplish the sexual intercourse by the use of force against the other person. With respect to this element, the state must first prove beyond a reasonable doubt that when the defendant

entered the dwelling in question, he intended to compel another person to engage in sexual intercourse. Sexual intercourse means vaginal intercourse or cunnilingus between persons regardless of sex. . . . The state must additionally prove beyond a reasonable doubt that when the defendant entered the dwelling, he intended to accomplish the sexual intercourse by the use of force against . . . the other person.''

The defendant does not claim that the court's instructions were improper. ''Barring contrary evidence . . . we must presume that juries follow the instructions given them by the trial judge.'' (Internal quotation marks omitted.) *State* v. *Morton*, 59 Conn. App. 529, 537, 757 A.2d 667 (2000). The defendant has not provided any evidence that the jury did not follow the instructions of the court.

The record discloses that the prosecutor read the charge of home invasion as stated in the information, and then indicated that the statute was wordy and gave a shorthand description of the crime, i.e., that the defendant unlawfully entered the dwelling with the intent to commit a sexual assault and commit a felony against another person. The prosecutor did not so much misstate the law as give an incomplete description of the charge against the defendant. The prosecutor, however, more than once told the jurors that the court would instruct them on the law and that the court's instructions were what counted. The defendant has not claimed that the court improperly charged the jury. We presume, in the absence of evidence to the contrary, that the jury followed the court's instructions. *State* v. *Webster*, 308 Conn. 43, 58–59 n.11, 60 A.3d 259 (2013). The defendant's claim, therefore, fails.

On the basis of our review of the record and for the reasons previously stated, we conclude that there was sufficient evidence by which the jury reasonably could have found the defendant guilty beyond a reasonable doubt of the crimes with which he was charged. Moreover, we conclude that the prosecutor committed no impropriety during her final argument and, therefore, the defendant was not denied his constitutional right to final argument, a fair trial, or due process.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was formerly known as Desmond James.

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[3] The victim's mother has five daughters, a son, and five stepchildren.

[4] During his cross-examination of the investigating police officers, the defendant elicited evidence that demonstrated errors in the fingerprint investigation and record keeping. See part II B 2 of this opinion.

[5] Renstrom explained that in dividing the DNA, the epithelial and sperm-rich fractions cannot be separated completely.

[6] In his motion for a judgment of acquittal, the defendant stated that to convict him of home invasion the state had to establish beyond a reasonable

doubt that when he entered the victim's home, he did so with the intent to compel another person to engage in sexual intercourse by the use of force or by the threat of use of force, which reasonably caused such person to fear physical injury. The defendant contended that there was no evidence to suggest or from which to infer that the perpetrator knew who lived in the home before he entered. Moreover, there is no evidence to suggest how long the perpetrator was in the victim's home or what he did in the home prior to awakening the victim. The defendant argued that the only evidence from which the jury possibly could infer the perpetrator's intent when he entered the home was the fact that he ultimately committed a sexual assault.

[7] In his motion for a new trial, the defendant asserted that the prosecutor's argument was improper because it was unsupported by evidence and amounted to unsworn testimony. The defendant claimed that the prosecutor mischaracterized the testimony of Gunjan Tiyyagura, an emergency department physician, regarding the cause of a tear to the victim's fourchette, and made an assertion about the DNA evidence for which there was no evidence. He also claimed that the court erred in failing to give the jury instruction on proof beyond a reasonable doubt that he had requested.

[8] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person . . . ."

The state also charged the defendant in three separate counts with sexual assault in the first degree in violation of § 53a-70 (a) (2), which provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[9] General Statutes § 53a-100aa (a) provides in relevant part: "A person is guilty of home invasion when such person enters . . . a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein, and, in the course of committing the offense: (1) Acting either alone or with one or more persons, such person or another participant in the crime commits or attempts to commit a felony against the person of another person other than a participant in the crime who is actually present in such dwelling . . . ."

[10] The defendant does not claim that the prosecutor's final argument raised any nonconstitutional issues such as a violation of the rules of practice; see Practice Book § 42-37; or a statutory right that he may have regarding final argument. See General Statutes § 54-88.

[11] Following the conclusion of the prosecutor's rebuttal argument, defense counsel objected to three statements the prosecutor made regarding the facts. The court overruled the objections, stating that the issues were for the jury to decide. On appeal, the defendant has not claimed that the court's rulings constituted an abuse of discretion.

[12] The defendant claims that he was not able to respond to the prosecutor's rebuttal argument regarding Renstrom's testimony about the probability of inclusion, the defendant's exclusion from the sperm-rich portion of the profile sample identified as 1 C-3, the fingerprint evidence, the victim's description of the perpetrator, and saliva found on the three swabs. We disagree that defense counsel was unable to respond to the issues cited. At the close of the first portion of her argument, the prosecutor stated that "[t]here are three letters you will not be able to get out of your head. Those letters are DNA." This argument put the defendant on notice of the state's theory of the case. During his closing argument, defense counsel pointed out errors concerning the DNA evidence and its testing, and how the police and the laboratory handled the fingerprints taken from the window in the bedroom of the victim's brother. Defense counsel also emphasized the inconsistencies between the victim's description of the defendant and the defendant's appearance. See part II of this opinion.

[13] The defendant also relies on *State* v. *Arline*, supra, 223 Conn. 52, and *State* v. *Hoyt*, 47 Conn. 518 (1880), for the proposition that an accused is entitled to argue to the trier of fact at the conclusion of the evidence. That constitutional right is not in dispute in the present case. The issue in the cited cases concerned the *trial court's* imposition of restrictions on counsel's argument, which is not the issue in the present instance.

In *Arline*, our Supreme Court reversed the judgment of conviction because the trial court restricted defense counsel's right to argue certain facts in evidence regarding the complainant's credibility. *State* v. *Arline*, supra, 223 Conn. 55-65. In *Hoyt*, the issue before the court was whether the trial court

had the discretion to limit the amount of time for argument. *State* v. *Hoyt*, supra, 47 Conn. 534–36. Neither case concerns the manner in which the state apportions its final argument.

[14] In his appellate brief, the defendant has cited cases from federal and state courts reversing criminal convictions in which the prosecutor gave a perfunctory opening summation and presented the bulk of the argument on rebuttal. As an intermediate court of appeal, we are bound to follow the law established by our legislature and our Supreme Court. "[W]e are unable to overrule, reevaluate, or reexamine controlling precedent . . . ." *State* v. *LaFleur*, 156 Conn. App. 289, 302, 113 A.3d 472, cert. denied, 317 Conn. 906, 114 A.3d 1221 (2015). We, therefore, follow Connecticut precedent.

[15] The defendant objected at trial to what he claims was the prosecutor's mischaracterization of the fingerprint testimony and thus preserved the claim for appellate review. He did not object to what he claims are new issues raised by the prosecutor in rebuttal. He, therefore, seeks appellate review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. Although the claim is reviewable, a constitutional violation did not exist, and the defendant was not deprived of a fair trial. See parts II and II B 2 of this opinion.

[16] Because we conclude that there was no prosecutorial impropriety, we need not address the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), to determine whether the defendant was denied due process.

[17] According to the defendant, the reasoning of the uniqueness fallacy is that "(1) there is a 1 in 52 million chance that a person could be included as a contributor to the mixture; (2) the defendant's profile was included as a contributor; (3) the population of Connecticut is about 3.5 million; therefore (4) the defendant is the only person whose profile would be included as a contributor to the mixture."

[18] In his appellate brief, the defendant cited M. Saks & J. Koehler, "The Individualization Fallacy in Forensic Science Evidence," 61 Vand. L. Rev. 199, 204 (2008).

[19] In his appellate brief, the defendant cited J. Koehler, "Error and Exaggeration in the Presentation of DNA Evidence," 34 Jurimetrics J. 21, 33 (1993).

[20] The defendant posits that many lawyers and judges have a difficult time interpreting probabilistic information. See J. Koehler, "Forensic Fallacies and a Famous Judge," 54 Jurimetrics J. 211, 212–17 (2014) (discussing three cases in which then Judge Richard A. Posner of the United States Court of Appeals for the Seventh Circuit committed basic errors in probabilistic reasoning, including DNA evidence).

[21] The defendant also argues that all of the *Williams* factors except the frequency of the impropriety weigh in favor of reversal. See footnote 16 of this opinion; *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). He contends that reversal is warranted because the state's case was relatively weak and the court gave no curative instruction. Because we conclude that the prosecutor committed no impropriety in her final argument, we need not address the *Williams* factors. Again, we note that trial counsel did not object to the portion of the prosecutor's argument at issue in this claim and requested no curative instruction.

---