******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JOSE DIEGO GONZALEZ
## (SC 20317)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Vertefeuille, Js.

*Syllabus*

Convicted of the crimes of sexual assault in the first degree, home invasion, and risk of injury to a child, the defendant appealed, claiming, inter alia, that he was deprived of his constitutional rights to present a closing argument and to a fair trial by virtue of the prosecutor's cursory review of the evidence during her initial closing summation followed by a more detailed discussion of the evidence during rebuttal argument. The defendant had entered the ten year old victim's home and sexually assaulted her. At trial, R, an analyst at the state forensics laboratory, testified that the defendant's DNA profile was included in the mixture found in the victim's vaginal swabs that had been taken after the sexual assault. R testified that the expected frequency of individuals who could be included as a contributor to that sample was approximately one in 52 million in the African-American population. In addition, two police detectives testified regarding efforts that the police had made to analyze fingerprints found on a window in the victim's home, and one of those detectives testified that he did not know how long the fingerprints that had been found were present. The Appellate Court affirmed the judgment of conviction, concluding that the prosecutor's closing argument did not prevent the defense from responding to the state's theory of the case and that the prosecutor did not mischaracterize the DNA and fingerprint evidence during her rebuttal argument. On the granting of certification, the defendant appealed to this court. *Held*:

1. The Appellate Court correctly concluded that the structure of the prosecutor's closing argument did not deprive the defendant of his constitutional rights:

a. The prosecutor did not deprive the defendant of his right to present a closing argument: the fact that defense counsel did not know the exact manner in which the prosecutor would marshal inculpatory evidence did not mean that the defendant was denied an opportunity to participate in the adversary process, as the evidence referenced in the prosecutor's rebuttal argument was presented during trial, the role that evidence played in the state's case was apparent, and the prosecutor's specific reliance on R's testimony during her rebuttal argument should have been no surprise because her initial summation made clear that DNA evidence was the cornerstone of the state's case; moreover, defense counsel attacked the reliability of the evidence forming the basis of the prosecutor's rebuttal argument during his closing argument, and, thus, he was aware of the evidence forming the basis of the prosecutor's rebuttal argument and had a fair opportunity to refute it; furthermore, defense counsel made a strategic decision to use his closing argument to question the testimony of the state's eyewitnesses and the reliability of the state's forensic evidence, and chose not to directly address R's testimony.

b. The prosecutor did not deprive the defendant of his due process right to a fair trial: the defendant failed to demonstrate that the prosecutor's substantive discussion of the evidence during rebuttal interfered with the ability of defense counsel to respond to the state's theory of the case, as the prosecutor's rebuttal was predicated on evidence that the prosecutor had presented at trial and on a theory of the case that the prosecutor articulated during her initial closing summation; moreover, given the central role the eyewitness testimony and forensic evidence played in the prosecutor's theory of the defendant's guilt, defense counsel was on notice that the prosecutor would likely rely on that evidence throughout her closing argument.

2. The defendant could not prevail on his claim that his constitutional rights to present a closing argument and to a fair trial were violated by virtue of the prosecutor's alleged mischaracterization of the DNA and fingerprint evidence during her rebuttal argument:

a. The prosecutor's rebuttal argument did not violate the defendant's right to present a closing argument: although defense counsel may have been prevented from directly responding to the prosecutor's contention during rebuttal that the defendant was the only person in Connecticut who could be a contributor to the DNA mixture found on the victim's vaginal swabs, he was not deprived of an opportunity to argue that R's statistical frequency testimony left room for reasonable doubt about the defendant's guilt; moreover, defense counsel did not address during his closing argument R's testimony, and the fact that defense counsel did not object to the prosecutor's characterization of R's testimony demonstrated that he did not believe the statements infringed on the defendant's constitutional rights.

b. Even if the prosecutor's statements regarding the DNA and fingerprint evidence were improper, the cumulative effect of those statements was harmless and did not deprive the defendant of his right to a fair trial: the prosecutor's statements relating to the DNA and fingerprint evidence were brief and made only once, any impropriety involving the prosecutor's characterization of the DNA evidence was not severe, and the negative impact of the prosecutor's statement explaining the lack of conclusive fingerprint evidence was minimal; moreover, any negative effect that the statements may have caused was likely mitigated by the trial court's general jury instructions, and the overall strength of the state's case against the defendant was strong.

Argued September 16, 2020—officially released March 2, 2021*

*Procedural History*

Substitute information charging the defendant with three counts of the crime of sexual assault in the first degree, and with one count each of the crimes of home invasion and risk of injury to a child, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Blue, J.*; verdict and judgment of guilty, from which the defendant appealed to this court; thereafter, the case was transferred to the Appellate Court, *Lavine*, *Keller* and *Bishop*, *Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Vishal K. Garg*, assigned counsel, for the appellant (defendant).

*Laurie N. Feldman*, deputy assistant state's attorney, with whom, on the brief, were *Patrick Griffin*, state's attorney, and *Stacey M. Miranda*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. This certified appeal requires us to consider whether alleged instances of impropriety during the prosecutor's closing argument deprived the defendant, Jose Diego Gonzalez, of his federal constitutional rights to present a closing argument under the sixth amendment, and his fourteenth amendment due process right to a fair trial.[1] After a jury trial, the defendant was convicted of three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of home invasion in violation of General Statutes § 53a-100aa (a) (1), and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). See *State* v. *Gonzalez*, 188 Conn. App. 304, 307, 204 A.3d 1183 (2019). The trial court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of sixty-five years of incarceration. Id., 307, 312. The defendant appealed from the trial court's judgment of conviction, claiming, among other things, that the prosecutor deprived him of his constitutional rights to present a closing argument and to a fair trial by (1) reserving her analysis of certain evidence for the rebuttal portion of her closing argument, and (2) mischaracterizing two pieces of evidence during rebuttal.[2] Id., 307, 318. The Appellate Court rejected those claims and affirmed the trial court's judgment. Id., 307, 342. The defendant now renews those same claims in the present appeal. For the reasons set forth in this opinion, we agree with the Appellate Court that neither the structure nor the content of the prosecutor's closing argument deprived the defendant of his constitutional rights and, accordingly, affirm the judgment of the Appellate Court.

The Appellate Court's decision sets forth the following relevant facts that the jury reasonably could have found. "The victim[3] was ten years old on October 15, 2014, when the defendant entered her first floor apartment in a three-family house in Meriden at approximately 3:40 a.m. At that time, the victim, her mother, her mother's boyfriend, and the victim's younger siblings and stepsiblings were asleep in their respective bedrooms. The front door, a living room window, and the victim's bedroom window faced the front of the house above the porch that ran across the front of the house. The victim's brother had a bedroom in the rear of the apartment with a window above a hatchway that the defendant could have used to enter the apartment.

"Earlier, at approximately 8 p.m., the victim had fallen asleep in her bed in the room that she shared with her stepsisters. The victim awoke shortly before 3:45 a.m. when she felt someone touch her lower back. She saw a black man with short dreadlocks leaning over her. She did not know him, asked him who he was, and what he was doing there. The defendant did not answer her but asked her how old she was. She stated that she

was eight years old, hoping that he would leave her alone. The defendant touched the victim's buttocks beneath her shorts and underwear. The victim pushed herself against the wall to stop him. The defendant took hold of the victim's ankles and put one over each of his shoulders and told her that 'this won't hurt . . . .'

"The defendant pulled the victim's shorts and underwear down to her knees and put a pillow over her face. He pulled down his own pants, and rubbed and licked the victim's vagina before penetrating it with his penis. The victim tried to get away from the defendant, but she could not free herself from his grip. When the defendant finished, he pulled up the victim's underwear and shorts and threatened to kill her if she told anyone what he had done. He covered her with a blanket and told her to go to sleep. The defendant walked out of the victim's bedroom and partially closed the door. The victim watched him walk through the kitchen toward her brother's bedroom. The window in her brother's room was wide open. No one else in the house was aware of the defendant's presence. The victim's sisters remained asleep, and her brother heard nothing.

"The victim's mother had awakened at approximately 3:20 a.m., gone into the kitchen to get a bottle to feed her infant, and returned to her bedroom. She saw no one in the apartment at that time. Later, when the victim's mother went back to the kitchen, she saw the victim standing at her bedroom door. The victim, shaking with fright, ran into the kitchen and stated that there was a 'black guy' in her room. When the victim and her mother entered the victim's bedroom, they saw the defendant peering in the window from the front porch. The victim's mother had never seen the man before. He had dark skin and a braid hanging out of his hoodie. The defendant ran toward the back of the house. The victim's mother tried to pursue him, but she could not keep up with him.

"The victim told her mother what the defendant had done to her. When the victim went to the bathroom, she saw a clear, wet substance on her vagina and asked her mother if she could wash. The victim's mother, who was medically trained, recognized the presence of semen in her daughter's underwear. She instructed the victim not to wipe off anything. The police were summoned." (Footnote added; footnote omitted.) Id., 307–309.

The victim was transported to Yale-New Haven Hospital where Deborah Jane Gallagher, a trained nurse, utilized a sexual assault evidence collection kit under the supervision of a physician, Gunjan Tiyyagura. Gallagher took samples from the victim using three swabs, two from the victim's vagina and one from the victim's posterior fourchette, which was torn and bleeding. Id., 309. Using one of the swabs, Gallagher prepared a smear on a glass slide. At the end of that examination, the

victim was taken to the Department of Children and Families' child sexual abuse clinic for a forensic interview conducted by Theresa Montelli. See id. During the course of that interview, the victim described the physical appearance of the perpetrator, noting that he had a scratch on his left cheek, appeared to be clean shaven, and was approximately forty years old. Id.

On October 17, 2014, the police arrested the defendant in Waterbury. At the time of his arrest, the defendant was twenty-three years old, had a full beard, mustache, and short dreadlocks. Id., 310. The police took a DNA sample from the defendant and sent it to the state forensics laboratory to develop a genetic profile that could be compared to the results of the sexual assault evidence collection kit. The police also recovered fingerprints from the window of the bedroom of the victim's brother; however, some of the fingerprints were insufficiently defined to be evaluated. Id.

At trial, Daniel T. Renstrom, an analyst at the state forensics laboratory, testified regarding his analysis of the samples received by the laboratory. Id. Specifically, Renstrom testified that he created genetic profiles for the victim, the defendant, and the material found on the three swabs contained in the sexual assault evidence collection kit. Id. In order to compare the DNA profiles of the victim and the defendant with the DNA profiles of those swabs, Renstrom separated the material on the swabs into two separate components, an epithelial-rich fraction and a sperm-rich fraction.[4] Id.

Renstrom was unable to determine whether the defendant was a contributor to the mixture of DNA in the sperm-rich fraction developed from the swab of the victim's posterior fourchette because there was an insufficient amount of DNA present. Id., 310–11. Pursuant to laboratory policy, Renstrom, accordingly, "eliminated" the defendant as a contributor to that sample. Id., 311. Renstrom did conclude, however, that the defendant's DNA profile was included in the DNA mixture found in the sperm-rich fraction of the vaginal swabs. See id. Renstrom testified that the expected frequency of individuals who could be included as a contributor to that sample is approximately one in 52 million in the African-American population, one in 66 million in the Caucasian population, and one in 37 million in the Hispanic population. Id. On redirect examination, Renstrom explained this statement as follows: "[s]o what that statistic is referring to is, if I were to take [the] general population, type those people, and then compare it to the . . . sample . . . the expected frequency of individuals who could be a contributor to that sample . . . is one in 52 million in the African-American population . . . ." The prosecutor then asked Renstrom if the population of Connecticut was three and one-half million, to which Renstrom responded, "[y]es."

In light of the nature of the claims presented in this appeal, we review, in detail, the closing arguments presented to the jury. The prosecutor began the initial portion of her closing argument by explaining that she intended to use her time to "highlight some of [the] evidence" that was presented over the course of the trial. The prosecutor made clear to the jury that its recollection of the evidence controlled, stating, "if you remember it differently, please remember that it's your recollection that counts."

The prosecutor then summarized the evidence concerning the events that transpired in the victim's home on the night of October 15, 2014. The prosecutor recounted the testimony of the ten year old victim, reminding the jury that the victim had testified that she had been awakened in the middle of the night by a strange man "with his hand underneath her pants and her panties, rubbing her lower back and her butt." The prosecutor reminded the jury that the victim had testified that the man told her, "it won't hurt," before he put a pillow over her face and raped her.

The prosecutor then stated that, "[b]ased on the horrific facts described by [the victim], the state has charged the defendant with five crimes: home invasion, three counts of sexual assault in the first degree, and risk of injury to a [child]." The prosecutor then reviewed the various counts of the substitute information, telling the jury that "[t]he judge, again, will have more detailed instructions, and you will have them in the jury room with you, and you will hear from His Honor after our arguments."

The prosecutor continued by stating the following: "[Y]ou're going to hear from the defense, and you're going to hear a lot of things about fingerprints and mistakes by the [laboratory or the police] with those fingerprints. You're also going to hear that . . . [the victim] and her mother could never pick out the [perpetrator] from [photographs] or in court." The prosecutor then turned to the evidence presented at trial, noting: "You all have heard that these crimes took place in the middle of the night, and [the victim's mother] told you she didn't know who he was, [the victim] told you she didn't know who he was, never seen him before, and [the victim's mother] told you she did not get a good look through the window." She then concluded by stating: "[The victim] saw some things about [the perpetrator] which I will discuss later. She also had a pillow over her face. You will hear all of these things and more from the defense, but while you are listening to their argument, there are three letters you will not be able to forget. There are three letters you will not be able to get out of your head. Those letters are DNA. I look forward to speaking with you."

Defense counsel then presented his closing argu-

ment. He began by again reminding the jury that only its recollection of the facts mattered for the purposes of its deliberations and noted that, on request, the jury could receive a transcript of any witness' testimony. He stated that his closing argument was his last opportunity to address the jury, stating: "I don't get two chances to speak to you. I would respond to counsel's . . . rebuttal argument, but that's not the way our system works, so please remember that."

Defense counsel then stated that "[t]he majority of [the] evidence in this case contradicts a piece of evidence that implicates the defendant." Defense counsel urged the jury to consider (1) the weight of contradictory evidence, (2) the absence of corroborating evidence, and (3) various weaknesses in the evidence actually presented. Defense counsel then pointed to the alleged inconsistencies in the evidence, noting the absence of any courtroom identification of the perpetrator and the discrepancies between the physical appearance of the defendant at the time he was arrested and the description the victim provided shortly after the attack.

Defense counsel then turned to the fingerprints that were found on the window of the bedroom of the victim's brother. Reminding the jury that the victim had seen the perpetrator enter her brother's bedroom and that the victim's mother had testified that she found the window open shortly after the attack, defense counsel stated: "It seems logical given the bulkhead . . . that that's the window that the perpetrator went into. It's also logical that, if you're pushing the window up, you might leave some prints there. . . . Could you imagine if his prints were found on that window, what we'd be looking at? . . . [T]he parade of evidence about the fingerprints and every one of them matching up to [the defendant's fingerprints] . . . . But those prints, he's excluded from leaving those prints; they're not his. . . . The state wants you to believe that, maybe, the kids were out there playing. They're not kids' prints. You heard the experts testify about that. [One] hundred years? The windows were there forever? I mean, come on, let's be serious." Defense counsel argued that the lack of fingerprint evidence connecting the defendant to the crime scene was "important" and undermined the state's case.

Defense counsel then turned his attention to the DNA evidence. He began by arguing that "[n]othing" corroborated the DNA evidence presented by the state. He argued that there was no evidence that the state tested the victim's underwear, her bedsheets, or the microscope slide that was prepared using a swab from the sexual assault evidence collection kit.

Defense counsel also attacked the reliability of the DNA evidence that was presented by the state. Arguing that the DNA evidence was "problematic," defense

counsel reminded the jury that the defendant was included as a contributor to a DNA profile developed from one sample but was eliminated as a possible contributor to another. Defense counsel stated, "[s]o, the one [source] that has the most seminal fluid, the one that results in the smear with the sperm, he's eliminated from. That's problematic. This is not a reliable result. If a result is unreliable, then statistics mean nothing."

Defense counsel next addressed the mistakes made in the collection and analysis of the forensic evidence presented at trial. Turning first to the fingerprints collected from the window, defense counsel noted that, even though experienced law enforcement personnel were involved in the recording and storing of the information at issue, fingerprints from an unrelated 2013 case were found to have been inadvertently included on a compact disc used for reviewing the fingerprints recovered from the window.

In his conclusion, defense counsel argued that "[t]he evidence and the lack of evidence doesn't allow you to accept the reliability of the DNA evidence in this case." Characterizing the DNA evidence as "conflicting" and the victim's description of the perpetrator as "contradictory" to the physical appearance of the defendant, defense counsel urged the jury not to decide the case on "blind faith."

The prosecutor began her rebuttal argument by arguing that the state was asking the jury to decide the case on the basis of science, not blind faith. The prosecutor stated that, although "the defendant [did not] leave his prints on the window . . . the evidence shows you he certainly left evidence from another part of his body behind," which "resulted in a DNA profile that only one in 52 million people in the African-American community have." With respect to the lack of fingerprints in particular, the prosecutor argued that "[w]e don't know where the prints came from or how long they've been there or if they've been there for 100 years. The prints tell us nothing and show you nothing and prove nothing."

The prosecutor then turned to the victim's testimony concerning the incident in question. She once again summarized the victim's account of the attack, her description of the perpetrator, and the events recounted by the victim's mother. The prosecutor then summarized the testimony from Gallagher and Tiyyagura about the administration of the sexual assault evidence collection kit, and reminded the jury that both had testified to the presence of semen on the victim, and to the collection of three separate swabs, one of which was used to create a smear on a microscope slide. The prosecutor then recounted Montelli's testimony, noting that the victim had given the same description of the perpetrator in both the forensic interview and in the courtroom.

The prosecutor, thereafter, addressed the DNA evidence and the testimony of the forensic experts who analyzed the contents of the sexual assault evidence kit. The prosecutor noted that Karen Lamy, a forensic science examiner, testified that she discovered sperm on the microscope slide contained in the sexual assault evidence collection kit, as well as saliva on all three swabs. The prosecutor then described how Renstrom developed the DNA profiles of the victim and the defendant, and how he then compared those profiles with the DNA mixtures found on the vaginal swabs. The prosecutor reminded the jury that the defendant was included as a contributor to one DNA mixture, but was excluded from another due to a limited amount of DNA found in the second sample.

The prosecutor concluded her rebuttal by arguing that Renstrom "attached a statistic to the [number] of times you would see that profile in a number of people. He told you that you would see the DNA profile of the defendant once in 52 million people in the African-American community. Think about that, ladies and gentlemen. You heard evidence that the whole state of Connecticut is 3.5 million people. If we filled the entire state of Connecticut with 3.5 million African-Americans, 52 million African-Americans would be the population of Connecticut times fourteen. So, if we placed 3.5 million African-Americans in Connecticut and stacked thirteen more states the size of Connecticut on top of that full of African-Americans, we would still only see that profile one time. That, ladies and gentlemen, is proof beyond a reasonable doubt."[5]

The trial court instructed the jury, in relevant part: "You are the sole judges of the facts. . . . You are to recollect and weigh the evidence and form your own conclusions as to what the facts are. You may not go outside the evidence presented in court to find the facts. . . . There are a number of things that may have been seen or heard during the trial that are not evidence and that you may not consider in deciding what the facts are. These include arguments and statements by the lawyers. The lawyers are not witnesses. Their arguments are intended to help you interpret the evidence, but they are *not evidence.* . . . [I]f the facts as you remember them differ in any way from the lawyers' statements, it's your memory that controls." (Emphasis added.)

The jury found the defendant guilty on all counts.[6] Thereafter, the trial court rendered a judgment of conviction in accordance with the jury's verdict. The defendant then appealed, claiming, inter alia, that prosecutorial impropriety during the state's closing argument deprived him of his sixth amendment right to present a closing argument, as well as his right to a fair trial.[7] *State* v. *Gonzalez,* supra, 188 Conn. App. 307, 318. Specifically, the defendant claimed that the prosecutor

improperly (1) delayed substantive discussion of evidence until after defense counsel's closing argument, and (2) mischaracterized certain evidence on rebuttal. Id., 318. In a unanimous decision, the Appellate Court concluded that the structure of the prosecutor's closing argument did not prevent the defense from responding to the state's theory of the case and, therefore, did not deprive the defendant of his right to present a closing argument or of his right to a fair trial. Id., 318–30. The Appellate Court also concluded that the prosecutor did not mischaracterize the DNA and fingerprint evidence during rebuttal and that her statements were not improper. Id., 330–38. This certified appeal followed.[8] Additional facts and procedural history will be set forth as necessary.

In the present appeal, the defendant claims that the Appellate Court incorrectly concluded that the structure of the prosecutor's closing argument, as well as her statements regarding certain fingerprint and DNA evidence, did not deprive him of his rights under the federal constitution. First, the defendant claims that the prosecutor's cursory review of the evidence during her initial summation, followed by her more detailed discussion of the evidence during rebuttal, prevented defense counsel from responding to the prosecutor's arguments concerning the defendant's guilt and, as a result, deprived him of his rights to present a closing argument and to a fair trial.[9] Second, the defendant claims that the prosecutor mischaracterized two separate pieces of evidence during her rebuttal argument and that those particular statements amounted to prosecutorial impropriety, which deprived the defendant of his rights to present a closing argument and to a fair trial. The defendant argues that he is entitled to a new trial on the grounds that he has proven that his sixth amendment right to present a closing argument was violated by these statements and that the state has failed to establish that the violation was harmless beyond a reasonable doubt. With respect to his general due process claim, the defendant claims that he is entitled to a new trial on the ground that he has shown that the prosecutor's statements amounted to improper conduct that deprived him of a fair trial.

In response, the state argues that the prosecutor's decision to reserve her substantive discussion of certain evidence for rebuttal was appropriate and that the Appellate Court, therefore, correctly concluded that the structure of the prosecutor's closing argument did not deprive the defendant of a fair trial or his right to present a closing argument. The state further argues that the Appellate Court correctly concluded that the prosecutor's statements regarding the DNA and fingerprint evidence were proper and, therefore, did not violate the defendant's constitutional rights.

For the reasons that follow, we conclude that neither

the structure nor the content of the prosecutor's closing argument deprived the defendant of a fair trial or his right to present a closing argument. Specifically, we conclude that the prosecutor's decision to reserve her discussion of certain evidence for rebuttal did not deprive the defendant of his right to be heard by counsel at the close of evidence and did not amount to prosecutorial impropriety. Similarly, we conclude that the prosecutor's alleged mischaracterizations of the DNA and fingerprint evidence did not prevent the defendant from presenting a closing argument that was responsive to the state's theory of the case and, therefore, did not deprive the defendant of his right to present a closing argument. Finally, assuming without deciding that the alleged mischaracterizations of the evidence were improper, we conclude that they were not sufficiently prejudicial as to deprive the defendant of a fair trial.

Before turning to the merits of the defendant's prosecutorial impropriety claims, we review the principles and law that govern our resolution of this appeal.[10] In cases in which a defendant claims that prosecutorial impropriety deprived him of his general due process right to a fair trial, "we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Internal quotation marks omitted.) *State* v. *Jordan*, 314 Conn. 89, 111, 101 A.3d 179 (2014).

The latter part of this two-pronged test is guided by the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). "These factors include . . . the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 561, 34 A.3d 370 (2012). "Under the *Williams* general due process standard, the defendant has the burden to show both that the prosecutor's conduct was improper *and* that it caused prejudice to his defense." (Emphasis added.) *State* v. *A. M.*, 324 Conn. 190, 199, 152 A.3d 49 (2016).

A different standard applies, however, when a defendant claims that prosecutorial improprieties infringed a specifically enumerated constitutional right. See, e.g., id., 199–200 (right to remain silent). In such cases, the burden is initially on the defendant to establish that a

specifically enumerated constitutional right was violated. Id., 199. If the defendant can establish that such a violation occurred, "the burden shifts to the state to prove that the violation was harmless beyond a reasonable doubt." Id. "This allocation of the burden of proof is appropriate because, when a defendant raises a general due process claim, there can be no constitutional violation in the absence of harm to the defendant caused by denial of his right to a fair trial. The constitutional analysis and the harm analysis in such cases are one and the same."[11] *State* v. *Payne*, supra, 303 Conn. 563–64

In the present case, the defendant claims that three separate instances of prosecutorial impropriety deprived him of his specifically enumerated right to present a closing argument, as well as his general due process right to a fair trial. Because of the nature of these claims, we apply both the harmless error standard called for in *Payne* and the general due process standard articulated in *Williams*. See *State* v. *A. M.*, supra, 324 Conn. 199 (noting "that the *Williams* standard applies only when a defendant claims that a prosecutor's conduct did not infringe on a specific constitutional right, but nevertheless deprived the defendant of his general due process right to a fair trial").

Guided by these distinct constitutional principles, we now address the merits of the defendant's claims related to the structure and content of the prosecutor's closing argument. First, we address the defendant's claim that the prosecutor violated his federal constitutional rights by reserving the substantive discussion of certain evidence for after defense counsel's closing argument. Second, we address the defendant's claim that the prosecutor violated his federal constitutional rights by mis-characterizing DNA and fingerprint evidence during her rebuttal.

I

We first address the defendant's claims that the prosecutor improperly structured her closing argument by reserving discussion of certain evidence for rebuttal and, in so doing, deprived him of (1) his sixth amendment right to present a closing argument, and (2) his right to a fair trial. For the reasons that follow, we conclude that the Appellate Court properly rejected both of these claims.

A

The defendant contends that the prosecutor, by saving her substantive discussion of evidence for rebuttal, deprived him of his constitutional right to present a closing argument by preventing him from responding to the state's theory of the case. The Appellate Court rejected this claim, concluding that the contents of defense counsel's closing argument demonstrated that the defendant was fully afforded an opportunity to respond to the state's theory of the case and to present

his theory of the defense. See *State* v. *Gonzalez*, supra, 188 Conn. App. 328–39. Having reviewed the record before us, we are compelled to agree.

"The right to the assistance of counsel ensures an opportunity to participate fully and fairly in the adversary [fact-finding] process. . . . The opportunity for the defense to make a closing argument in a criminal trial has been held to be a basic element of the adversary process and, therefore, constitutionally protected under the sixth and fourteenth amendments. . . . Closing argument is an integral part of any criminal trial, for it is in this phase that the issues are sharpened and clarified for the jury and each party may present his theory of the case. . . .

"The right to present a closing argument is abridged not only when a defendant is completely denied an opportunity to argue before the court or the jury after all the evidence has been admitted, but also when a defendant is deprived of the opportunity to raise a significant issue that is reasonably inferable from the facts in evidence. This is particularly so when . . . the prohibited argument bears directly on the defendant's theory of the defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Arline*, 223 Conn. 52, 63–64, 612 A.2d 755 (1992).

"[T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations." (Citation omitted; internal quotation marks omitted.) Id., 59. As this court has repeatedly held, "[c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 76, 43 A.3d 629 (2012).

Whether a prosecutor infringes on the constitutional rights of a criminal defendant by reserving the bulk of his or her discussion of the evidence for rebuttal is a matter of first impression for this court. With regard to the appropriate scope of rebuttal argument more generally, this court has previously noted that, in Connecticut, "[t]here is no rigid requirement that a prosecutor's final summation must be limited solely to rebuttal of matters raised in the defendant's argument." *State* v. *Rosa*, 170 Conn. 417, 428, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976). Practice Book § 42-35 simply provides in relevant part: "Unless the judicial authority for cause permits otherwise, the parties shall proceed with the trial in the following order . . . (4) The prosecuting authority

shall be entitled to make the opening and final closing arguments. (5) The defendant may make a single closing argument following the opening argument of the prosecuting authority."

In the present case, the defendant asks us to recognize that his sixth amendment right to present a closing argument prohibited the prosecutor from reserving her discussion of the evidence for rebuttal. According to the defendant, this decision prevented him from knowing how the state would marshal the evidence against him. The defendant contends that, without this knowledge, he was unable to effectively rebut the prosecutor's arguments and was deprived of his "last clear chance to persuade the trier of fact that there may be reasonable doubt of [his] guilt." *Herring* v. *New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975).

The defendant's claim is unavailing for two reasons. First, the defendant's contention that the right to be heard by counsel encompasses a right to respond to the exact manner in which the state has marshaled the evidence is unsupported by case law from either this state or other jurisdictions. Second, the defendant's claim that he was deprived of an opportunity to respond to the state's theory of the case, and its view as to how the evidence proved that theory, is unsupported by the record.

The courts of this state have consistently recognized that the sixth amendment right to present a closing argument protects a criminal defendant's right to present his theory of the defense at the close of evidence. See *State* v. *Arline*, supra, 223 Conn. 64 (noting that "[t]he right to present a closing argument is abridged . . . [if] a defendant is deprived of the opportunity to raise a significant issue that . . . bears directly on the defendant's theory of the defense"); see also *State* v. *Cunningham*, 168 Conn. App. 519, 537, 146 A.3d 1029 (holding that defendant was not deprived of right to present closing argument because, "although the [trial] court precluded the defendant from listing . . . the elements of manslaughter . . . defense counsel was allowed to present . . . his theory of the defense"), cert. denied, 323 Conn. 938, 151 A.3d 385 (2016); *State* v. *Ross*, 18 Conn. App. 423, 433–34, 558 A.2d 1015 (1989) (defendant's right to present closing argument was violated when trial court prevented defense counsel from commenting that state's sole eyewitness did not testify at trial).[12] In order to present a theory of the defense, the defendant must be aware of the state's theory of the case and of the evidence that the prosecutor will argue supports that theory. See *State* v. *Cobb*, 251 Conn. 285, 417, 743 A.2d 1 (1999) (noting that prosecutor's closing argument is bound only by facts in evidence and theory presented in "the information and the bill of particulars"), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

In support of his contention that his right to present a closing argument was violated, the defendant relies heavily on the United States Supreme Court's decision in *Herring* v. *New York*, supra, 422 U.S. 853, and our prior decision in *State* v. *Arline*, supra, 223 Conn. 52.[13] Neither the facts nor the principles articulated in those two cases support the defendant's argument.

In *Herring*, the United States Supreme Court invalidated a New York state law that gave judges the discretion to deny criminal defendants in nonjury criminal trials the opportunity to present a closing argument before rendering judgment. See *Herring* v. *New York*, supra, 422 U.S. 853, 862–63. In that case, the court held that a total denial of the defendant's opportunity to present a final argument violates the right to assistance of counsel guaranteed by the sixth amendment. Id., 858–59; see id., 859 ("a total denial of the opportunity for final argument in a nonjury criminal trial is a denial of the basic right of the accused to make his defense"). Likewise, in *Arline*, we held that a defendant was deprived of his right to present a closing argument when the trial court precluded defense counsel from arguing during final summation that the state's chief witness, the sexual assault complainant, had a motive to fabricate the allegations underlying the state's case. See *State* v. *Arline*, supra, 223 Conn. 55–56, 58. Noting that "the linchpin of the defense was attacking the credibility of [the complainant]," we concluded that the trial court's actions barring the defense from presenting an exculpatory theory during defense counsel's summation deprived the defendant of his right to present a closing argument.[14] Id., 64.

Neither *Herring* nor *Arline* supports the defendant's contention that the right to present a closing argument includes the right to respond to the exact manner in which the state argues the evidence. Unlike the present case, *Herring* and *Arline* involved trial court interference that absolutely precluded both defendants from presenting the theory of their defenses. In the appeal before us, the complained of conduct did not deprive the defense of an opportunity to argue at the close of evidence and did not preclude the defense from presenting an exculpatory theory to the jury. The fact that defense counsel did not know the exact manner in which the prosecutor would marshal inculpatory evidence does not mean the defendant was denied an "opportunity to participate fully and fairly in the adversary [fact-finding] process." (Internal quotation marks omitted.) *State* v. *Arline*, supra, 223 Conn. 63, quoting *Herring* v. *New York*, supra, 422 U.S. 858. We, therefore, conclude that the defendant's interpretation of the scope of the right to present a closing argument is unsupported by existing case law.

The defendant's claim that he was prevented from addressing the prosecutor's evidentiary arguments due

to the structure of her summation is also unsupported by the record. The defendant specifically claims that the structure of the prosecutor's closing argument prevented him from properly framing the following pieces of evidence for the jury: (1) Renstrom's testimony concerning the expected frequency of individuals who could be included as contributors to the DNA mixture found on the vaginal swabs; (2) the defendant's exclusion from the sperm-rich fraction of the DNA sample taken from the victim's posterior fourchette; (3) the fingerprint evidence recovered from the window in the bedroom of the victim's brother; (4) the victim's testimony regarding the perpetrator's physical appearance; and (5) the saliva found on the three swabs contained in the sexual assault evidence collection kit.

Contrary to the defendant's claims, the structure of the prosecutor's closing remarks did not force the defense "into the position of deciding what to address without knowing how the state would attempt to meet its burden." Each of these pieces of evidence was presented to the jury during the course of the trial, and the role that evidence played in the state's theory of the case was readily apparent. The prosecutor's reliance on Renstrom's testimony, in particular, could not have come as a surprise. Although the prosecutor did not refer explicitly to statistical frequencies or differentiate between swabs during her initial summation, she did make clear that the DNA evidence was the cornerstone of the state's case, stating that, "while you are listening to [defense counsel's] argument, there are three letters you will not be able to forget. . . . Those letters are DNA."

We reach this conclusion, in part, as the result of our review of the substance of defense counsel's own closing argument. During his summation, defense counsel directly attacked the reliability of the evidence that formed the basis of the prosecutor's rebuttal argument. As the Appellate Court's decision aptly noted, defense counsel "pointed out the weaknesses in the state's case: the victim and her mother were unable to identify the perpetrator in court or from photographs, the victim's description of the perpetrator was not consistent with his appearance, there was no fingerprint evidence from the window where the perpetrator supposedly entered the dwelling, the DNA evidence was uncorroborated, and the nurse [had initially testified to using] two swabs to collect DNA from the victim but there were three swabs in the rape kit in the laboratory . . . ." *State* v. *Gonzalez*, supra, 188 Conn. App. 328.

Defense counsel dedicated much of his closing argument to questioning the reliability of the state's DNA evidence and the forensic laboratory's conclusion that the defendant was included in one sperm-rich fraction but not the other. Characterizing the laboratory's conclusions as contradictory, defense counsel argued that

the state's DNA evidence, in its entirety, was not reliable, stating: "They come from the same source. They're entered into the same machine. They're all at the same low frequency and outer edges and ranges of validity. They're diametrically opposed results. One he's included, one he's eliminated. Both have mixtures; one he's included, one he's eliminated. . . . So the one that has the most seminal fluid, the one that results in the smear with the sperm, he's eliminated from. That's problematic. This is not a reliable result. If a result is unreliable, then statistics mean nothing [and] 100 percent of nothing equals nothing."

Contrary to the defendant's assertions, at the time defense counsel presented his closing argument, he was aware of the inculpatory evidence that formed the basis of the prosecutor's closing argument and had a fair opportunity to rebut it. Defense counsel made the strategic decision to use his closing argument to call into question the consistency of the testimony of the state's eyewitnesses and the reliability of its forensic evidence. Indeed, in his brief, the defendant concedes that the defense "chose not to directly address Renstrom's testimony about the expected frequency of individuals that could be included as contributors to the mixture." On the basis of our review of the record and the substance of defense counsel's closing argument, it is clear that the defense was able to argue, and had a fair opportunity to argue, a theory that was responsive to the state's evidence.

In sum, although the structure of the prosecutor's closing argument precluded the defense from responding to the exact manner in which the prosecutor argued the evidence, the defendant was not deprived of the opportunity to present a defense that was responsive to the state's overall theory of the case. The state's case against the defendant and the evidence used to support it were clear and consistent throughout the course of the trial. We conclude that the structure of the prosecutor's summation did not violate the defendant's sixth amendment right to present a closing argument, and, therefore, his first claim of prosecutorial impropriety must fail.

B

We now consider whether the structure of the prosecutor's closing argument deprived the defendant of his due process right to a fair trial. The defendant argues that the structure of the prosecutor's closing argument was improper and deprived him of a fair trial because it "prevented the defense from meaningfully responding to the [prosecutor's] substantive argument." The state disagrees, arguing that the prosecutor's closing argument was proper and did not implicate the defendant's due process rights. We agree with the state.

Because the defendant's second prosecutorial impro-

priety claim alleges a violation of his general due process right to a fair trial, we review this claim under the general due process standard articulated in *Williams*. See *State* v. *A. M.*, supra, 324 Conn. 199. As explained previously, the *Williams* general due process standard involves the application of a two step analytical process. "The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 275, 973 A.2d 1207 (2009). The defendant carries the burden of proof under both steps and, therefore, must establish that the complained of conduct was both improper and so egregious that it resulted in a denial of due process. See *State* v. *Payne*, supra, 303 Conn. 562–63.

We have previously recognized that "[p]rosecutorial [impropriety] of constitutional magnitude can occur in the course of closing arguments." (Internal quotation marks omitted.) *State* v. *Otto*, supra, 305 Conn. 76. "In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) Id.

"While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 38, 100 A.3d 779 (2014). "Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Otto*, supra, 305 Conn. 76.

No statute or rule of practice in this state limits the scope of the prosecutor's rebuttal to issues raised in preceding arguments.[15] See *State* v. *Rosa*, supra, 170 Conn. 428 (noting that "[t]here is no rigid requirement that a prosecutor's final summation must be limited solely to rebuttal of matters raised in the defendant's argument"). Due process considerations, however, necessarily restrict the prosecutor's closing argument to facts in evidence; see *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002); and the theory of the case disclosed in the pleadings. See *State* v. *Cobb*, supra, 251 Conn. 417 (state's theory of case at closing argument is bounded "by the information and the bill of particulars").

With these principles in mind, we turn to the defendant's claim that the prosecutor deprived him of a fair trial by reserving the bulk of her discussion of the evidence for rebuttal. Viewing the prosecutor's rebuttal argument in the context of the entire trial, we conclude that the structure of the prosecutor's closing argument was not improper and, therefore, did not implicate the defendant's due process rights.

As we explained in part I A of this opinion, the record demonstrates that the prosecutor's analysis of the evidence during her rebuttal argument did not interfere with the ability of the defense to present a closing argument that was responsive to the state's theory of the case. During her rebuttal, the prosecutor did not introduce a new theory or rely on facts not in evidence. Instead, the prosecutor used her rebuttal to analyze the evidence that supported the state's case—namely, that the DNA evidence established the defendant's guilt beyond a reasonable doubt. Defense counsel, at the time of closing, was aware of that argument and had a fair opportunity to address it.[16] As a result, we conclude that the structure of the prosecutor's summation was not improper.

The case law that the defendant cites in support of the opposite conclusion is unavailing. In his brief, the defendant cites various state and federal cases in which appellate courts have reversed criminal convictions on the ground that the prosecuting authority impermissibly reserved the bulk of its argument for rebuttal. The federal cases cited by the defendant turn on the application of statutory and procedural rules that differ from those of our state and are, therefore, inapplicable to our consideration of the defendant's claim.[17]

State court decisions cited by the defendant, some of which turn on constitutional considerations, are likewise distinguishable from the present case. The defendant relies heavily on the Delaware Supreme Court's decision in *Bailey* v. *State*, 440 A.2d 997 (Del. 1982). In *Bailey*, the Delaware Supreme Court concluded that a trial court committed reversible error when it allowed a prosecutor to present a five minute opening summation followed by more than an hour-long rebuttal argument that covered issues not previously raised by either party. Id., 1000–1003. Noting that, "[b]ecause of the brevity of the [s]tate's opening summation, defense counsel was left to guess which issues the [s]tate would discuss in its rebuttal," the Delaware Supreme Court concluded that the prosecutor's strategy struck "a blow to [the] defendant's right to a fair trial" and that reversal was, therefore, warranted.[18] Id., 1003.

Unlike in *Bailey*, the prosecutor's opening summation and presentation of the evidence in the present case provided defense counsel with notice of the state's theory of the case and alerted the defense to the key

evidence that the state would rely on in support of its theory. The prosecutor, at the beginning of her initial summation, recounted the victim's testimony concerning the attack that she suffered at the hands of an unknown intruder on the night of October 15, 2014. At the conclusion of her initial summation, the prosecutor made clear how the state would prove beyond a reasonable doubt that the defendant was the unknown intruder who attacked the victim, telling the jury that, as it listened to defense counsel's closing argument, "[t]here are three letters you will not be able to get out of your head. Those letters are DNA." Unlike in *Bailey*, the structure of the state's summation did not leave the defendant "left to guess which issues the [s]tate would discuss in its rebuttal." *Bailey* v. *State*, supra, 440 A.2d 1003. This is not a case in which the prosecutor refrained from engaging in a substantive discussion of the charges, the underlying elements, or the evidence that the state believed supported its case during her initial summation. The state's presentation of the evidence, coupled with the prosecutor's opening summation, made the state's theory of the case abundantly clear and alerted the defendant to how the state would use the evidence to prove that theory. We therefore conclude that the defendant's reliance on *Bailey* is unavailing.[19]

Considering the structure of the prosecutor's closing argument in light of the entire trial, we conclude that the defendant has failed to demonstrate that the prosecutor's substantive discussion of the evidence during rebuttal interfered with his ability to respond to the state's theory of the case. The record reveals that the prosecutor's rebuttal was predicated on the evidence that the state had presented at trial and on the theory of the case that the prosecutor articulated during her opening summation. Given the central role that the eyewitness testimony and forensic evidence played in the state's theory of the defendant's guilt, defense counsel was on notice that the prosecutor would likely rely on that evidence throughout her closing argument. Indeed, as we noted previously, defense counsel addressed the evidence that formed the basis of the state's theory of the case during his closing argument. We therefore conclude that the defendant has failed to show that the structure of the prosecutor's closing argument amounted to prosecutorial impropriety.[20]

## II

Having determined that the defendant's claims with respect to the structure of the prosecutor's closing argument must fail, we now turn to the defendant's claims that two particular statements made by the prosecutor during her rebuttal deprived him of his right to present a closing argument and, when considered together, had the cumulative effect of depriving the defendant of his general due process right to a fair trial. Specifically, the

defendant contends that the prosecutor mischaracter-
ized both the DNA evidence and the fingerprint evi-
dence presented at trial. According to the defendant,
the timing and severity of these two alleged mischarac-
terizations prevented the defense from responding to
the prosecutor's arguments.

The following facts and procedural history are rele-
vant to our resolution of these claims. With respect to
the DNA evidence, the prosecutor summarized Ren-
strom's testimony as follows: "Renstrom then attached
a statistic to the [number] of times you would see that
[DNA] profile in a number of people. He told you that
you would see the DNA profile of the defendant once in
52 million people in the African-American community.
Think about that, ladies and gentlemen. You hear evi-
dence that the whole state of Connecticut is 3.5 million
people. If we filled the entire state of Connecticut with
3.5 million African-Americans, 52 million African-
Americans would be the population of Connecticut
times fourteen. So, if we placed 3.5 million African-
Americans in Connecticut and stacked thirteen more
states the size of Connecticut on top of that full of
African-Americans, we would still only see that profile
one time. That, ladies and gentlemen, is proof beyond
a reasonable doubt."

With respect to the fingerprint evidence, testimony
was presented at trial from detectives John Cerejo and
Steve Burstein of the Meriden Police Department
regarding efforts that the police made to remove and
analyze the fingerprints found on the window located
in the bedroom of the victim's brother. See *State* v.
*Gonzalez*, supra, 188 Conn. App. 335. During his testi-
mony, Cerejo stated that a variety of factors, including
sun and rain, can impact the length of time that finger-
prints remain detectable on a surface. Id. Burstein testi-
fied that the window in question was exposed to the
elements and that he did not know how long the finger-
prints had been present. Id. Burstein further testified
that, although he was not sure when the house had
been built, he estimated that it "probably [was] 100
years ago or so . . . ." (Internal quotation marks omit-
ted.) Id. During her rebuttal argument, the prosecutor
stated: "We don't know where the prints came from or
how long they've been there or if they've been there
for 100 years."

The defendant contends that the prosecutor mischar-
acterized Renstrom's testimony concerning the number
of individuals who would be expected to be included
in the DNA mixture found on the vaginal swabs. He
argues that the prosecutor, by comparing the expected
frequency of inclusion with the population of Connecti-
cut, and by stating that the defendant's DNA profile
would appear only once per 52 million African-Ameri-
cans, suggested to the jury that the DNA evidence estab-
lished that the defendant was the only person in

Connecticut whose DNA could match the DNA profile identified in that sample. The defendant argues that this statement is a product of two errors in probabilistic reasoning, the so-called "uniqueness fallacy" and the "probability of another match error." (Internal quotation marks omitted.) According to the defendant, because this statement is the product of probabilistic fallacies, it cannot be considered a reasonable inference from the evidence.

The defendant likewise claims that the prosecutor mischaracterized the testimony of Cerejo and Burstein, and that these mischaracterizations amounted to the introduction of extraneous evidence because no evidence was presented at trial concerning the age of the fingerprints. As with the defendant's claims concerning the structure of the prosecutor's closing argument, we address separately the impact of these alleged mischaracterizations on (1) the defendant's sixth amendment right to present a closing argument, and (2) his right to a fair trial.

A

We first consider the defendant's claim that the prosecutor's alleged mischaracterizations of the evidence violated the defendant's sixth amendment rights. Specifically, the defendant argues that the prosecutor's alleged mischaracterizations of the DNA and fingerprint evidence during rebuttal prevented him from responding to the prosecutor's arguments and, as a result, deprived him of his sixth amendment right to present a closing argument. The defendant focuses primarily on the prosecutor's characterization of the DNA evidence and claims that, because the statement was made during rebuttal, he was prevented from "putting [the evidence] in context" with his "theory" that the DNA evidence was unreliable due to errors in the collection, preservation, and testing of the items in the sexual assault evidence collection kit. In response, the state argues that the prosecutor's statements did not mischaracterize the evidence and, instead, drew reasonable inferences from Renstrom's testimony. According to the state, because the prosecutor's statements were directly related to testimony presented at trial, the inclusion of the statements in the prosecutor's rebuttal argument did not impact the defendant's ability to present a closing argument that was responsive to the state's theory of the case. We agree with the state.

As we noted previously in this opinion, the sixth amend ment right to assistance of counsel protects a criminal defendant's right to present his theory of the defense at the close of evidence. See, e.g., *State* v. *Arline*, supra, 223 Conn. 55–56. In the present case, the prosecutor's rebuttal argument concerning the DNA evidence did not deprive the defendant of an opportunity to respond to the state's theory of the case or to present his own defense. At the close of the prosecutor's initial summa-

tion, she made clear that she would rely on the DNA evidence to argue that the state had proven the defendant's guilt beyond a reasonable doubt. During his closing argument, defense counsel directly attacked the DNA evidence, arguing that, due to errors in the collection, preservation, and testing of the items in the sexual assault evidence collection kit, the DNA evidence should be disregarded in its entirety. Although defense counsel may have been prevented from directly responding to the prosecutor's contention that the defendant was the only person in Connecticut who could be a contributor to the DNA mixture, he was not deprived of an opportunity to argue that the statistical probabilities presented by Renstrom left some room for reasonable doubt about the defendant's guilt. As we previously noted, defense counsel's decision to refrain from addressing Renstrom's statistical frequency testimony during counsel's closing argument was his decision to make. Put differently, the defendant's ability to frame that evidence for the jury was not impacted by the prosecutor's rebuttal argument.

Furthermore, in considering whether an alleged prosecutorial impropriety violated a specifically enumerated constitutional right, we look to the contemporaneous reaction of defense counsel. See, e.g., *State* v. *Cassidy*, 236 Conn. 112, 131, 672 A.2d 899 (overruled in part on other grounds by *State* v. *Alexander*, 254 Conn. 290, 295, 755 A.2d 868 (2000)), cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996). As we have noted in prior decisions, we assume that defense counsel will object or seek a curative instruction from the trial court if, at the time of the alleged impropriety, defense counsel believed the conduct was improper and violated the defendant's constitutional rights. See, e.g., *State* v. *A. M.*, supra, 324 Conn. 207–208. In the present case, the absence of an objection to the prosecutor's characterization of the DNA evidence demonstrates that, at the time of trial, defense counsel did not believe the statement infringed on the defendant's constitutional rights.

For the foregoing reasons, and on the basis of the record before us, we conclude that the prosecutor's characterization of the evidence during her rebuttal argument did not infringe on the defendant's sixth amendment right to present a closing argument. As a result, the defendant's third claim of prosecutorial impropriety must fail.

B

Finally, we address the defendant's claim that the prosecutor's alleged mischaracterizations deprived him of his right to a fair trial. The defendant argues that the Appellate Court incorrectly concluded that the prosecutor's statements relating to DNA and fingerprint evidence were not improper and, therefore, did not violate the defendant's due process rights. Specifically, the defendant argues that these statements, which were

made during the prosecutor's rebuttal, rose to the level of prosecutorial impropriety because they mischaracterized the evidence presented at trial and prejudiced him because he was unable to respond to them. The state disagrees, arguing that the prosecutor's characterization of the evidence was proper and did not impact the defendant's right to a fair trial.

Assuming, without deciding, that the prosecutor's statements were improper, we conclude that the cumulative effect of the allegedly improper remarks was harmless and did not deprive the defendant of his right to a fair trial. See, e.g., *State* v. *Grant*, 286 Conn. 499, 542, 944 A.2d 947, cert. denied, 55 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008); see also *State* v. *Gibson*, 302 Conn. 653, 663 n.4, 31 A.3d 346 (2011) (noting that "this court occasionally has skipped the first step of [the two step prosecutorial impropriety] analysis when . . . it was clear that there was no due process violation").

In conducting such an analysis, "we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 539. In doing so, "[w]e do not . . . focus only on the conduct of the [prosecutor]. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial [impropriety]." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 50, 917 A.2d 978 (2007).

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in [*Williams*] with due consideration of whether that misconduct was objected to at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 362, 897 A.2d 569 (2006). In applying the *Williams* factors, "we must determine whether (1) the impropriety was invited by the defense, (2) the impropriety was severe, (3) the impropriety was frequent, (4) the impropriety was central to a critical issue in the case, (5) the impropriety was cured or ameliorated by a specific jury charge, and (6) the state's case against the defendant was weak due to a lack of . . . evidence." *State* v. *Fauci*, supra, 282 Conn. 51.

As we previously noted in this opinion, "prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prose-

cutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 611, 65 A.3d 503 (2013).

"We must [also] give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The [prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 583–84, 849 A.2d 626 (2004). It, therefore, "does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 611.

With these principles in mind, we turn to the application of the *Williams* factors to the allegedly improper statements made by the prosecutor during her rebuttal argument. Viewing the alleged "incidents of misconduct . . . in relation to one another and within the context of the entire trial"; *State* v. *Stevenson*, supra, 269 Conn. 574; we conclude that the two alleged mischaracterizations did not deprive the defendant of his right to a fair trial. Specifically, our review of the record as a whole leads us to the conclusion that, even if the rhetorical devices employed by the prosecutor were technically imprecise, the negative impact of those statements was limited and, as a result, did not result in a due process violation.

The first and third *Williams* factors are in relative equipoise. Although noting that the defendant was included as a contributor to the DNA profile developed from one sample but excluded from the other, defense counsel attacked the general reliability of the DNA evidence without specifically discussing the statistical probabilities testified to by the DNA expert. Defense counsel also emphasized the fact that the defendant's fingerprints were not found on the window he was suspected of using to enter the apartment. He specifically challenged the prosecutor's claim that the recovered fingerprints were left by children, stating: "They're not kids' prints. You heard the experts testify about that. [One] hundred years? The windows were there forever? I mean, come on, let's be serious." On the one hand, we cannot conclude that the precise manner in which the prosecutor framed the DNA and fingerprint evidence presented at trial was invited in any meaningful way by the defense. It is equally clear, however, that both of the statements at issue were brief and were

made only once by the prosecutor.

We next consider whether the alleged improprieties were severe. "In determining whether the prosecutorial impropriety was severe, this court consider[s] it highly significant that defense counsel failed to object to . . . the improper [remark], [to] request curative instructions, or [to] move for a mistrial." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 51. In the present case, defense counsel objected to the prosecutor's statement concerning the fingerprint evidence but failed to object to the prosecutor's characterization of Renstrom's statistical frequency testimony. Insofar as the prosecutor's statements concerning the DNA evidence used imprecise language, defense counsel had the opportunity to object or seek a corrective instruction from the trial court but chose not to do so, which suggests that he did not view the statement as overly prejudicial.[21]

"Beyond defense counsel's failure to object, in determining the severity of prosecutorial impropriety, we look to whether the impropriety was blatantly egregious or inexcusable." Id. The prosecutor's argument that the defendant was the only person in Connecticut who could have left the DNA found on the victim's vagina was based on Renstrom's testimony that the expected frequency of inclusion was "one in 52 million in the African-American population . . . ." Although Renstrom did not, in fact, testify that the defendant's genetic profile was necessarily unique in that population, the general argument advanced by the prosecutor was more simplistic: that the jury could infer the defendant's guilt from the fact that it was exceedingly unlikely that someone other than the defendant was the source of the DNA discovered on the victim. See *State* v. *Jones*, 115 Conn. App. 581, 597–600, 974 A.2d 72 (holding that it was not improper for prosecutor to argue that defendant's DNA was contained in DNA mixture found in victim when evidence was presented at trial that defendant was included as contributor to mixture), cert. denied, 293 Conn. 916, 979 A.2d 492 (2009); see also *State* v. *Brett B.*, 186 Conn. App. 563, 584, 200 A.3d 706 (2018), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019). Thus, the prosecutor's comparison of the frequency of inclusion statistic with the population of Connecticut, although imprecise, merely asked the jury to draw a reasonable inference from testimony already in evidence. This fact, coupled with defense counsel's failure to object, leads us to conclude that any impropriety involving the prosecutor's characterization of the DNA evidence should not be characterized as severe.

With respect to the prosecutor's statement concerning the fingerprint evidence, we agree with the Appellate Court that "[t]he obvious point of the prosecutor's argument was that there was no evidence as to whose fingerprints were on the window or when they hap-

pened to be put there. With a hyperbolic flourish, the prosecutor incorporated the testimony that the house was estimated to be [100] years old to emphasize that no one knew when or who put fingerprints on the window." *State* v. *Gonzalez*, supra, 188 Conn. App. 336. The force of this rhetorical device was, no doubt, lessened by the fact that defense counsel, in closing, expressly urged the jury to disregard it, stating, "[t]hey're not kids' prints. You heard the experts testify about that. [One] hundred years? The windows were there forever? I mean, come on, let's be serious." We, therefore, conclude that the negative impact of the prosecutor's statement relating to the fingerprint evidence presented at trial was minimal. See *State* v. *Ruiz*, 202 Conn. 316, 329, 521 A.2d 1025 (1987) ("the remarks do not exceed permissible limits for rhetorical hyperbole by counsel engaged in advocating a cause under our adversary system").

Next, we consider whether the claimed improprieties involved a critical issue in the case. This particular factor favors the defendant's claim relating to the use of the DNA evidence because the prosecutor's alleged mischaracterization of Renstrom's testimony clearly implicated the evidentiary cornerstone of the state's case. The fingerprint evidence, by contrast, cannot be considered critical to the state's theory of identity because the recovered fingerprints did not tie the defendant to the scene of the crime.

Fifth, we consider whether the trial court adopted curative measures to ameliorate the impropriety. Although the trial court did not address the alleged mischaracterizations with specific instructions, it did issue the following general charge to the jury: "You are the sole judges of the facts. . . . You are to recollect and weigh the evidence and form your own conclusions as to what the facts are. You may not go outside the evidence presented in court to find the facts. . . . There are a number of things that may have been seen or heard during the trial that are not evidence and that you may not consider in deciding what the facts are. These include arguments and statements by the lawyers. The lawyers are not witnesses. Their arguments are intended to help you interpret the evidence, but they are *not evidence.* . . . [I]f the facts as you remember them differ in any way from the lawyers' statements, it's your memory that controls." (Emphasis added.) As this court has previously stated, "[i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 485, 832 A.2d 626 (2003); see also *State* v. *Collins*, 299 Conn. 567, 590, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). This instruction likely mitigated any negative impact that the alleged mischaracterizations may have had. This is especially true with respect to the alleged impro-

priety related to Renstrom's testimony, which was not subject to a specific objection at trial. See *State* v. *A. M.*, supra, 324 Conn. 207 ("in nearly all cases [in which] defense counsel fails to object to and request a specific curative instruction in response to a prosecutorial impropriety, especially an impropriety that we do not consider to be particularly egregious, and the court's general jury instruction addresses that impropriety, we have held that the court's general instruction cures the impropriety").

Finally, we consider the overall strength of the state's case against the defendant. The jury had before it testimony that the defendant was included as a contributor to a DNA mixture recovered from the victim's vagina. The jury also heard testimony that there was an infinitesimally low probability that a randomly selected person other than the defendant would be expected to be included in that mixture. Furthermore, the jury heard testimony that, shortly after the assault, the ten year old victim provided a physical description of the perpetrator that, in large part, matched the physical appearance[22] of the defendant on the day that he was arrested. Such evidence, although not overwhelming, is particularly strong. See *State* v. *Thompson*, supra, 266 Conn. 483 ("we have never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial misconduct did not deprive the defendant of a fair trial").

To summarize, the prosecutor's alleged mischaracterizations, even if not invited, were neither frequent nor severe, and any negative impact they may have caused would have been ameliorated by the trial court's general instructions to the jury. We therefore conclude that the defendant was not denied a fair trial under the framework set forth in *Williams*, and reversal of the defendant's convictions is, therefore, unwarranted.

For the foregoing reasons, we conclude that the alleged instances of prosecutorial impropriety did not deprive the defendant of his right to present a closing argument or of his right to a fair trial. We conclude that the structure of the prosecutor's closing argument did not deprive the defendant of his right to present an argument through counsel at the close of evidence and was not improper. Similarly, we conclude that the prosecutor's statements concerning the DNA and fingerprint evidence during rebuttal did not prevent the defendant from presenting a closing argument that was responsive to the state's theory of the case and, therefore, did not deprive the defendant of his right to present a closing argument. Furthermore, assuming without deciding that the alleged mischaracterizations of the evidence were improper, we conclude that they were not sufficiently prejudicial as to deprive the defendant of a fair trial.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* March 2, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The sixth amendment right to counsel is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *State* v. *Ruffin*, 316 Conn. 20, 28–29 n.4, 110 A.3d 1225 (2015), overruled in part on other grounds by *State* v. *A. M.*, 324 Conn. 190, 152 A.3d 49 (2016); *State* v. *Andrews*, 313 Conn. 266, 272 n.3, 96 A.3d 1199 (2014); see also footnote 8 of this opinion.

[2] The defendant initially appealed to this court, and we transferred the appeal to the Appellate Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[4] Renstrom explained that this process, known as "differential extraction," involves isolating the sperm cells from the epithelial cells found on the swabs. Renstrom explained that, once the cells were isolated, he created sperm-rich and epithelial-rich fractions for both the vaginal swabs and the swab of the posterior fourchette. He then compared the DNA profiles of the known samples taken from the victim and the defendant with the DNA profiles of the sperm-rich and epithelial-rich fractions. Renstrom noted that both epithelial-rich fractions contained the DNA of only one person, the victim, whereas the sperm-rich fractions contained a mixture of DNA from the victim and at least one other person.

[5] At the conclusion of the prosecutor's rebuttal argument, and after the jury had left the courtroom, defense counsel raised three objections to statements made by the prosecutor during her closing argument. Defense counsel objected to (1) the prosecutor's statement that the fingerprints could have been on the window for 100 years, (2) the prosecutor's statement that Tiyyagura had testified that the tear in the victim's posterior fourchette could have resulted only from forced penetration, and (3) the prosecutor's statement that no person, including the defendant, could have been identified as a contributor to the DNA sample the defendant was eliminated from. The court overruled those objections.

[6] The defendant filed a motion for a judgment of acquittal on his conviction of home invasion and a motion for a new trial on the ground that prosecutorial impropriety deprived him of a fair trial. The trial court denied both of those motions. The claims raised by the defendant in his motion for a new trial are not the same as those he now raises on appeal. See *State* v. *Gonzalez*, supra, 188 Conn. App. 312 n.7.

[7] On appeal to the Appellate Court, the defendant also claimed that the state had presented insufficient evidence that he had intended to commit sexual assault by force at the time he entered the victim's home. See *State* v. *Gonzalez*, supra, 188 Conn. App. 307. That claim is not, however, at issue in the present appeal.

[8] This court granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the defendant's right to due process was not violated by prosecutorial impropriety during closing arguments?" *State* v. *Gonzalez*, 332 Conn. 901, 208 A.3d 280 (2019).

We note that the defendant's sixth amendment claim is within the scope of the certified question because "[a] defendant's right to present a defense is rooted in the compulsory process and confrontation clauses of the sixth amendment . . . [which] are made applicable to state prosecutions through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Andrews*, supra, 313 Conn. 272 n.3; see also footnote 1 of this opinion.

[9] The defendant's brief to this court presents these two constitutional claims simultaneously, citing the degree of "overlap" between them. Because these claims require the application of distinct legal principles, we address them separately in this opinion.

[10] In light of the Appellate Court's express application of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), to the claims raised by the defendant; see *State* v. *Gonzalez*, supra, 188 Conn. App. 318–19; we take this opportunity to reiterate that "a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of [*Golding*] and, similarly, it is unnecessary for a reviewing

court to apply the four-pronged *Golding* test." (Citation omitted; internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 360, 897 A.2d 569 (2006); see also *State* v. *Payne*, 303 Conn. 538, 560, 34 A.3d 370 (2012); *State* v. *Fauci*, 282 Conn. 23, 34–35, 917 A.2d 978 (2007); *State* v. *Luster*, 279 Conn. 414, 427, 902 A.3d 636 (2006).

[11] The burden is, thus, always on the defendant to show that prosecutorial impropriety resulted in the violation of a constitutional right. See *State* v. *A. M.*, supra, 324 Conn. 199–200; see also *State* v. *Payne*, supra, 303 Conn. 562–63. This is true regardless of whether the defendant claims a violation of his or her general due process right to a fair trial or a violation of a specifically enumerated constitutional right.

[12] The vast majority of federal and state courts have described this right in a manner consistent with our holding in *Arline*. See, e.g., *United States* v. *Miguel*, 338 F.3d 995, 1008 (9th Cir. 2003) (referring to right to present closing argument as "the fundamental right under the [s]ixth [a]mendment to present a relevant theory of the defense"); *Conde* v. *Henry*, 198 F.3d 734, 739 (9th Cir. 1999) ("denying an accused the right to make final arguments on his theory of the defense denies him the right to assistance of counsel"); see also *People* v. *Marshall*, 13 Cal. 4th 799, 855, 919 P.2d 1280, 55 Cal. Rptr. 2d 347 (1996) (no sixth amendment violation when trial court allowed defense counsel to argue that defendant's case "lacked the cruelty and callousness found in other murder cases," but prohibited defense counsel from referring to specific facts of other cases), cert. denied, 520 U.S. 1157, 117 S. Ct. 1338, 137 L. Ed. 2d 497 (1997); *State* v. *Liberty*, 498 A.2d 257, 260 (Me. 1985) (concluding that trial court deprived defendant of right to present closing argument by precluding defendant from discussing exculpatory evidence during summation); *State* v. *Frost*, 160 Wn. 2d 765, 777–79, 161 P.3d 361 (2007) (trial court "infringed upon [defendant's] [s]ixth [a]mendment right to counsel" by precluding defendant from arguing that state failed to prove element of charged offense), cert. denied, 552 U.S. 1145, 128 S. Ct. 1070, 169 L. Ed. 2d 815 (2008).

Moreover, the defendant's interpretation of the right to present a closing argument is discordant with the widely accepted practice of the prosecutor having the final word in closing argument. See, e.g., J. Tanford, "Closing Argument Procedure," 10 Am. J. Trial Advoc. 47, 77–78 (1986) (noting that, "[i]n a majority of states, the prosecution always argues first and last, regardless of who has the burden of proof"); see also *Tucker* v. *Marshall*, Docket No. 08 Civ. 7820 (DLC), 2009 WL 2742603, *20 n.8 (S.D.N.Y. August 27, 2009) ("[I]n federal court, as in New York, the prosecutor is given the last opportunity to speak in closing arguments . . . . [W]e are aware of no precedent to the effect that the [s]ixth or [f]ourteenth [amendment] command[s] that defense counsel be given the opportunity to respond to the response" (Citations omitted.)).

[13] The defendant also cites *State* v. *Hoyt*, 47 Conn. 518, 536 (1880), in support of his sixth amendment claim under the United States constitution. This court's decision in *Hoyt* addressed only the right to present a closing argument under the Connecticut constitution. Id., 535–36. In his brief, the defendant does not independently argue that the alleged improprieties violated his right to present a closing argument under the state constitution. We, therefore, do not address the scope of the state constitutional right in this opinion.

[14] In *State* v. *Arline*, supra, 223 Conn. 65 n.11, we cited with approval the Maine Supreme Court's reasoning in *State* v. *Liberty*, 498 A.2d 257 (Me. 1985), which described the right protected in the following manner: "In a closing argument, each party should be permitted to summarize the case from the perspective of that party's interpretation of all the evidence in the case and the inferences to be drawn therefrom. It is not for the [judge] to proscribe argument as to a portion of the evidence which the jury has heard." Id., 259.

[15] General Statutes § 54-88, the only statutory provision relating to closing arguments, provides: "In any criminal trial, the counsel for the state shall be entitled to open and close the argument." As stated previously, Practice Book § 42-35 likewise provides in relevant part: "[u]nless the judicial authority for cause permits otherwise, the parties shall proceed with the trial in the following order . . . (4) The prosecuting authority shall be entitled to make the opening and final closing arguments. (5) The defendant may make a single closing argument following the opening argument of the prosecuting authority."

[16] As noted previously in this opinion, defense counsel used his closing argument to call into question the reliability and veracity of the evidence that the prosecutor discussed during her rebuttal, arguing that "[t]he majority of [the] evidence in this case contradicts a piece of evidence that implicates

the defendant." Specifically, during closing, defense counsel argued that Renstrom's conclusions regarding the inclusion of the defendant's DNA were contradictory and, therefore, "mean nothing." He argued that the victim's description of the perpetrator on the night of the attack was inconsistent with the defendant's physical appearance at the time of his arrest. Defense counsel also called into question the state's handling of the sexual assault evidence collection kit, arguing that procedural mistakes rendered the DNA evidence unreliable.

[17] The federal cases cited by the defendant turn on the application of Federal Rule of Criminal Procedure 29.1, which has been interpreted by federal courts as limiting the scope of rebuttal argument to issues raised by the defense during its closing. See *United States* v. *Alegria*, Docket No. S 90 Cr. 0450 (RWS), 1991 WL 238223, *11–12 (S.D.N.Y. November 6, 1991); see also *United States* v. *Taylor*, 728 F.2d 930, 937 (7th Cir. 1984) (noting that "limitation on rebuttal is supported by the legislative history of rule 29.1," which "outlines the order of closing arguments in a criminal trial"). Rule 29.1 "does not establish a constitutional doctrine, but rather, provides a uniform rule of federal practice" and is, therefore, irrelevant to our consideration of the defendant's constitutional claims. See *United States* v. *Byrd*, 834 F.2d 145, 147 (8th Cir. 1987); see also *United States* v. *Garcia*, 94 F.3d 57, 63 (2d Cir. 1996).

[18] The Delaware Supreme Court has subsequently limited *Bailey* to its facts. In *Lovett* v. *State*, 516 A.2d 455, 470 (Del. 1986), cert. denied, 481 U.S. 1018, 107 S. Ct. 1898, 95 L. Ed. 2d 504 (1987), the Delaware Supreme Court distinguished *Bailey* and held that a prosecutor's discussion of facts not previously discussed during his opening summation did not deprive the defendant of a fair trial.

[19] The defendant cites several other cases from our sister states that are similarly distinguishable. See *People* v. *Robinson*, 31 Cal. App. 4th 494, 505, 37 Cal. Rptr. 2d 183 (1995) (holding that state procedural rules do not permit prosecutor to give rebuttal argument ten times longer than opening summation); see also *Presi* v. *State*, 73 Md. App. 375, 377, 534 A.2d 370 (1987) (holding that trial court abused its discretion by allowing prosecutor to raise new issue during rebuttal that was prejudicial to defendant), cert. denied, 312 Md. 127, 538 A.2d 778 (1988); *State* v. *Peterson*, 423 S.W.2d 825, 830–31 (Mo. 1968) (granting new trial when state argued issues relating to appropriate punishment of defendant for first time on rebuttal).

[20] We pause to note that this conclusion should not be taken as a blanket approval of so-called prosecutorial "sandbagging." Rather, we simply conclude that the prosecutor in the present case did not structure her closing argument in a manner that deprived the defense of an opportunity to respond to her evidentiary arguments and to the state's theory of the case, and, as a result, that her conduct did not rise to the level of prosecutorial impropriety. Prosecutors should avoid structuring their closing arguments in a manner that reserves the entirety of their summation for rebuttal, which could implicate a defendant's constitutional rights. Of course, under such circumstances, trial judges have discretion and are in the best position to fashion an appropriate remedy, including providing the defendant with an opportunity to make additional closing arguments to the jury. See Practice Book § 42-35 (providing judges with discretion over order of closing argument).

[21] The defendant argues that, due to the "subtle and clever" nature of the errors in probabilistic reasoning employed by the prosecutor, defense counsel's failure to object to the prosecutor's statement concerning the DNA evidence should not be considered when evaluating the prejudicial nature of the statement. Subtleties are, however, often less severe by nature. As a result, we see no reason to depart from the well established rule relating to the absence of an objection in the present case.

[22] The victim stated during her forensic interview that the defendant was clean shaven. The defendant, when he was arrested three days after the attack, had a beard and mustache. The victim, however, also testified that the perpetrator was black and had short dreadlocks and a scratch on his face. The defendant possessed all of these additional characteristics at the time of his arrest.